2006-NMCA-077

137 P.3d 1204

**FARMINGTON POLICE OFFICERS ASSOCIATION COMMUNICATION WORKERS OF AMERICA LOCAL 7911, Vince Mitchell and Paul Martinez, Plaintiffs–Appellees,**

v.

**CITY OF FARMINGTON, Farmington Police Department, Mark McCloskey, and Doug McKim, Defendants–Appellants.**

No. 24,972.

Court of Appeals of New Mexico.

May 17, 2006.

William J. Tryon, Albuquerque, NM for Appellees.

Bingham, Hurst, Apodaca & Wile, P.C., Michael W. Wile, Albuquerque, NM for Appellants.

## OPINION

ALARID, Judge.

{1} This case presents us with an opportunity to harmonize the procedural standards governing summary judgment with the substantive standards for determining which party's understanding should prevail in a dispute over the meaning of a contractual term. We hold that, in the present case, the Plaintiffs failed to eliminate genuine issues of material fact bearing upon which party's interpretation should control. We therefore reverse the grant of summary judgment in Plaintiffs' favor.

## BACKGROUND

{2} Plaintiffs Vince Mitchell and Paul Martinez were at all material times full-time peace officers employed by Defendants Farmington Police Department (the FPD) and City of Farmington (the City), working as agents with the Region II Narcotics Task Force (Task Force). Plaintiff Communication Workers of America Local 7911 (Union) is the collective bargaining representative of the Farmington Police Officers Association. The City and the Union were parties to a collective bargaining agreement (the CBA). The CBA included the following terms:

ARTICLE 7. MANAGEMENT RIGHTS

Under this article, subject to existing law, management shall have the right to:

A. Hire, promote, reclassify, transfer, assign, lay off and recall employees;

B. Reprimand, suspend, demote, discharge or otherwise discipline employees[.]

ARTICLE 26. EMPLOYEE INVESTIGATIONS AND DISCIPLINE

. . . .

A. The Police Department reserves the right to investigate all allegations of employee misconduct in accordance with NMSA 29–14 et. seq.

. . . .

E. Employees will cooperate in all investigations conducted by the department. Failure to cooperate may be the basis for disciplinary action up to and including termination.

. . . .

H. Disciplinary actions, other than verbal or written reprimands or warnings, may be appealed through the grievance procedure contained in this agreement through the process of arbitration. Written reprimands may be grieved to the level of the City Manager. If the written reprimand stands after the City Manager's response, the employee may attach a written response to the written reprimand being placed in the employee's file.

ARTICLE 27. GRIEVANCE PROCEDURE

A. Purpose

The purpose of this grievance procedure shall be to secure, at the lowest possible administrative level, equitable resolutions to problems which may arise and are subject to review under this procedure. There shall be no other grievance or appeal procedure on any matter for members of the bargaining unit other than that contained in this Article.

B. Definitions

1. A "grievance" shall be defined as a dispute pertaining to a claim which alleges a violation of this collective bargaining agreement, and termi-nations, suspensions without pay and demotions. Written reprimands cannot be appealed to arbitration.

ARTICLE 32. SPECIALITY POSITION SELECTION

It is the policy of the Farmington Police Department at this time to allow employees to apply for certain assignments/positions within the employee's existing rank. The Department will continue to allow such application in whole or in part so long as the Chief determines that doing so results in the appropriate distribution of Department staff. The fact that an employee has applied and been selected into an assignment /position in no way limits the right of the Department to reassign the employee when the Chief determines that doing so is in the best interest of the Department.

A. The Chief's determination regarding what constitutes "the best interest of the Department" is the exclusive determination of the Chief of Police. The grievance procedure will be followed through and including the City Manager who will be the final step and decision for this process concerning this section.

ARTICLE 34. ANALYSIS FOR ILLEGAL DRUG USE

Statement of Principle: The Employer and the Union jointly recognize that the use of drugs and alcohol, whether on or off the job or for so-called "recreational" purposes or otherwise, constitutes a serious threat to the health and safety of the public, to the safety of officers, and to efficient operation of the department.

{3} On January 17, 2002, Defendant FPD Chief Mark McCloskey sent out an interoffice memorandum ordering all members of the FPD assigned to the Task Force to answer the following two questions:

1. Have you ever consumed alcoholic beverages either on-duty or off and then driven a work vehicle from the location where the alcohol was consumed? If so, describe such events in detail. List those who were with you when this activity occurred.

2. Do you have any knowledge of Region II (Farmington Office) personnel consuming alcoholic beverages on duty or off and then driving a work vehicle? If so, describe such incidents in detail. List those present at such events in your explanation.

Officers to whom the questions were directed were given the following written instructions:

You are being required to truthfully answer the questions listed below. Your responses to these questions must be placed in a sealed envelope and submitted to Sergeant Ledwitch before the end of your tour of duty on the day you receive this document. **You are not to discuss this topic or your responses in any manner with anyone including other member [sic] of this office and including civilians who may have witnessed or participated in the behavior described above.**

{4} As of January 17, 2002, Mitchell and Martinez were assigned to the Task Force as undercover narcotics agents under the supervision of Defendant FPD Lt. Doug McKim. Mitchell and Martinez received Chief McCloskey's memorandum. Seven of the nine officers who received the memorandum responded by answering the two questions. Mitchell and Martinez responded in writing stating that they were willing "to comply with the request and answer all allegations honestly and truthfully." Mitchell and Martinez did not answer the questions, instead choosing to treat the two written questions as an "interrogation" purportedly triggering various procedural rights under the CBA and Section 4 of the Peace Officer's Employer–Employee Relations Act, NMSA 1978, § 29–14–4(C) (1991) (the POEERA). FPD Sgt. Mark Ledwitch informed Mitchell and Martinez that Chief McCloskey had decided to place them on administrative leave for insubordination unless they answered the questions by the end of work on January 18, 2002. On January 18, 2002, Mitchell and Martinez answered the questions under protest, asserting that Chief McCloskey's January 17, 2002, memo constituted an unlawful order in violation of the CBA and the POEERA. In their answers, Mitchell and Martinez admitted consuming alcoholic beverages while on call. From similarities in their responses, it appeared to Chief McCloskey that Mitchell and Martinez had cooperated in preparing their responses.

{5} On January 30, 2002, Chief McCloskey notified Mitchell and Martinez in separate interoffice memoranda that they had been found to have violated FPD policies:

1. The questionnaire was very specific in the directions that those answering the questions were not to discuss the topic of the memo with anyone in any manner. These directions were bolded so that they would be adhered to. You chose to disregard this directive and, by your own admission, discussed the questionnaire and your response with others. The directive was issued so that answers would be independent and so that answers would be individual. It was also issued so that answers would not be discussed and compared. Your answers (both of them) were identical to the answers of another agent. It was obvious you both worked together to fashion your responses. For failing to follow a lawful directive, you are deemed to have violated Code of Conduct section 1.04, *Insubordination and Intemperate Behavior* which states you will obey any lawful directive of a supervisor.

2. You also admit that you have, on occasion, consumed alcoholic beverages while off duty when you were on-call and then driven your assigned vehicle which is a violation of Policy 299–02, *Vehicle Fleet System*. If you were to be called out after consuming alcoholic beverages and had contact with the public with the odor of an alcoholic beverage on your breath it would be considered unprofessional and could not be tolerated. You are compensated for being on-call and therefore have an obligation to maintain yourself in a condition conducive to responding should you be called out.

{6} Chief McCloskey also determined that in an unrelated incident Mitchell and Martinez had acted unprofessionally in the course of serving a search warrant. Chief McCloskey found that Martinez drew his firearm and pointed it at a "racist" drawing; that Mitchell angrily removed the drawing without an investigative purpose in removing the

drawing; that Martinez stepped on the drawing as it lay on the floor; and that Martinez damaged a second drawing by putting his fist through it. Chief McCloskey reached the following conclusions:

> Article 32 of the collective bargaining agreement between the City and CWA which is currently in effect states that I have the right to reassign employees assigned to specialty positions when doing so is determined to be in the best interest of the Department. In this case, it would also be in the best interest of the Region II Narcotics Task Force. Such determination is exclusively mine. Therefore, it [is] my determination that it would be in the best interest of the Department for you to be *reassigned* to the Patrol Division effective February 10, 2002. . . .

> In addition to the reassignment, you can consider this memo a *written reprimand* for the violations of the Code of Conduct and Policy as described above.

{7} Mitchell and Martinez pursued grievances from Chief McCloskey's decision to transfer them out of the Task Force. Their grievances were denied by the FPD. The denials were upheld by the City Manager.

{8} Mitchell and Martinez sought arbitration. Bob Hudson, the City Manager, denied the demand for arbitration. According to Hudson, during negotiations between the Union and the City, the Union had proposed making reassignment from a specialty position subject to arbitration under the CBA, while the City had proposed making reassignment from a specialty position non-grievable under any circumstances. In Hudson's view, Article 32 of the CBA, by allowing reassignments to be grievable up to and including the City Manager, reflected a compromise between these two positions, and the CBA clearly and unambiguously provided that an appeal to the City Manager was the final step in grieving reassignments from a specialty position. Hudson advised Plaintiffs' counsel that he had documentation of the bargaining history of Article 32 and urged counsel to contact members of the Union's negotiating committee to confirm the bargaining history of Article 32.

{9} Thereafter, the Union, joined by Mitchell and Martinez, filed a complaint in the district court, naming the City, the FPD, Chief McCloskey, and Lt. McKim as Defendants. Plaintiffs sought an order compelling arbitration. The City filed an answer in which it admitted that the Union is the exclusive bargaining agent for the collective bargaining unit comprised of FPD police officers. Defendants denied any obligation to arbitrate the decision to transfer Mitchell and Martinez out of the Task Force. Defendants asserted a counterclaim for malicious abuse of process.

{10} The parties agreed to file simultaneous cross-motions for summary judgment. In support of their motion, Plaintiffs attached Article 27 of the CBA; portions of Chief McCloskey's deposition in which he conceded that "[i]f I was in their [Mitchell and Martinez's] shoes I would perceive it [the reassignment] as discipline"; and affidavits in which Mitchell and Martinez stated that the reassignments were punitive, resulted in lessened responsibilities and reduced pay, and undermined their career opportunities. Plaintiffs argued that the reassignment from the Task Force was a disciplinary matter subject to arbitration pursuant to Article 27 D. 8 of the CBA. Defendants argued in support of their motion that Mitchell and Martinez had failed to follow procedures mandated by the CBA in bringing their grievance and that under Article 32 of the CBA the reassignment out of the Task Force was not subject to arbitration. Defendants attached the entire CBA as an appendix to their motion. Defendants also attached copies of correspondence between Plaintiffs and Defendants documenting the dispute, beginning with the January 17, 2002, memo from Chief McCloskey, and concluding with an April 24, 2002, letter from Hudson to Plaintiffs' counsel in which Hudson reiterated the City's position that the reassignment from the Task Force back to patrol duties was not arbitrable under the CBA and that this position was supported by the bargaining history of the CBA.

{11} Defendants also filed a response to Plaintiffs' motion for summary judgment. Defendants characterized the central issue

before the district court as "[w]ere the transfers of Mitchell and Martinez from the Region II Task Force to Farmington Police Department patrol duties reassignments from specialty positions under Article 32 of the [CBA], or were they demotions?" Defendants argued that the transfers were not demotions within the meaning of the CBA and that Article 32 gave the Chief of Police "unfettered authority to transfer Mitchell and Martinez out of the Task Force specialty positions."

{12} The district court entered an order granting Plaintiffs' motion and denying Defendants' motion. The district court included findings that the transfer out of the Task Force to patrol duty with the FPD was disciplinary action as defined by the CBA "[a]s a matter of law," that the Plaintiffs timely pursued their grievance, that the Plaintiffs substantially complied with the requirements of the grievance procedure, and that the Plaintiffs are entitled to have their grievance heard by an arbitrator. Defendants filed a motion for reconsideration, which the district court denied. Defendants moved to dismiss their counterclaim pursuant to Rule 1–041(A)(2) NMRA. The district court granted the motion. Defendants then filed a notice of appeal from the order granting Plaintiffs' motion for summary judgment and denying Defendants' motion for summary judgment.

## DISCUSSION

{13} An appeal from an order granting a motion for summary judgment presents a question of law subject to de novo review. *Bartlett v. Mirabal*, 2000–NMCA–036, ¶ 4, 128 N.M. 830, 999 P.2d 1062. Under this standard of review, we step into the shoes of the district court, reviewing the motion, the supporting papers, and the nonmovant's response as if we were ruling on the motion in the first instance.

{14} Rule 1–056 NMRA provides as follows:

A. **For claimant.** A party seeking to recover upon a claim, counterclaim or cross-claim or to obtain a declaratory judgment may move with or without supporting affidavits for a summary judgment in his favor upon all or any part thereof.

. . . .

C. **Grounds for motion.** The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

{15} A party who will bear the burden of persuasion on a claim or affirmative defense at trial must satisfy a stringent burden to justify summary judgment:

When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it "must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial." In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party.

*United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir.1991) (applying Fed.R.Civ.P. 56) (internal quotation marks and citations omitted).

{16} A party seeking judicial enforcement of a contract bears the burden of persuasion. *See Camino Real Mobile Home Park P'ship v. Wolfe*, 119 N.M. 436, 442, 891 P.2d 1190, 1196 (1995) (discussing burden of proof in an action for breach of warranty). Although no New Mexico case appears to have addressed the issue, we believe that where the meaning of a material contract term is in dispute a party seeking affirmative relief based upon its interpretation necessarily bears the burden of establishing that its interpretation controls. *See Frigaliment Importing Co. v. B.N.S. Int'l Sales Corp.*, 190 F.Supp. 116, 121 (S.D.N.Y.1960) (ruling that plaintiff-buyer had the burden of proving that parties to sales contract used buyer's definition of "chicken"). This approach is consistent with the general default rule allocating the burden of persuasion in civil cases to the party who invokes the authority of a court to alter the extrajudicial status quo. *E.g., Atlantic & Pac. Ins. Co. v. Barnes*, 666

P.2d 163, 165 (Colo.Ct.App.1983). Transferred to this case, this principle means that Plaintiffs bore the burden of establishing that Mitchell's and Martinez's reassignments from the Task Force back to patrol duty were arbitrable personnel decisions under the CBA.

 {17} In determining which issues of fact are material facts for purposes of Rule 1–056(C), we look to the substantive law governing the dispute. *See Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000) (applying Fed.R.Civ.P. 56(c)). The substantive rules governing the interpretation of contracts are summarized in the Restatement (Second) of the Law of Contracts:

Whose Meaning Prevails

(1) Where the parties have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning.

(2) Where the parties have attached different meanings to a promise or agreement or a term thereof, it is interpreted in accordance with the meaning attached by one of them if at the time the agreement was made

(a) that party did not know of any different meaning attached by the other, and the other knew the meaning attached by the first party; or

(b) that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party.

(3) Except as stated in this Section, neither party is bound by the meaning attached by the other, even though the result may be a failure of mutual assent.

Restatement (Second) of Contracts § 201 (1981).

 {18} Subsection (1) codifies a subjective standard of mutual assent: "[i]f the parties to a contract attach the same meaning to their expression, it should prevail over the meaning which a hypothetical reasonable party would attach." John Edward Murray, Jr., *Murray on Contracts* § 87, at 416 (3d ed.1990). Subsection (2)(a) codifies a rule based on concerns of fairness that prevents a party who knows that the other party has attached a different meaning to a term from taking advantage of the misunderstanding. E. Allan Farnsworth, *Contracts* § 7.9, at 506 (2d ed.1990). Plaintiffs did not come forward with evidence of what the Union and the City actually believed about the scope of arbitration or what the Union or the City knew about each other's understanding of the scope of arbitration when they entered into the CBA, and, accordingly, we cannot sustain the district court's entry of summary judgment under Subsection (1) or Subsection (2)(a), each of which turns upon the subjective states of mind of the City and the Union as of the time the CBA was made.

 {19} Subsection 2(b) codifies the objective theory of contractual assent. Under this objective approach "what is operative is the objective manifestations of mutual assent." *See Pope v. The Gap, Inc.*, 1998–NMCA–103, ¶ 13, 125 N.M. 376, 961 P.2d 1283 (discussing role of mutual assent in contract formation; citing and quoting Restatement (Second) of Contracts § 20 (1981)). Application of an objective standard does not require inquiry into the actual understandings of the parties, but, rather, depends upon what hypothetical reasonable contracting parties[1] would have had reason to know under the circumstances. For Plaintiffs to prevail under Subsection 2(b)'s objective standard, Plaintiffs were required to show that the Union had no reason to know that the City understood the CBA to preclude arbitration of reassignments imposed as discipline and that the City had reason to know that the Union understood the CBA to provide for arbitration of reassignments imposed

---

**1.** Because Subsection 2(b) applies an objective standard of reasonableness, it can be used to resolve disputes over the meaning of a term when there is no evidence of the parties' subjective understandings of a term. Farnsworth, *supra*, at 510 (observing that "[i]n many disputes arising out of contemporary business transactions ... the parties gave little or no thought to the impact of their words on the case that later arose.... The court will then have no choice but to look solely to a standard of reasonableness. Interpretation cannot turn on meanings that the parties attached if they attached none, but must turn on the meaning that reasonable persons in the positions of the parties would have attached if they had given the matter thought.").

as discipline. Transferred to the context of summary judgment, Plaintiffs were required to demonstrate the absence of genuine issues of material fact as to what the City and the Union had reason to know of the other's understanding of the CBA. Because Plaintiffs did not come forward with any extrinsic evidence of what each party had reason to know at the time of the making of the CBA, summary judgment can be sustained only if the CBA itself is sufficient to eliminate genuine issues of material fact as to what each had reason to know.

{20} Having carefully reviewed the terms of the CBA, we are persuaded that the CBA itself cannot eliminate genuine issues of material fact as to the arbitrability of the present dispute. We hold that a fair-minded reader, considering the language of the CBA in its entirety and without the aid of extrinsic evidence of the parties' intentions, would necessarily conclude that both parties have articulated interpretations to which the CBA is reasonably susceptible.

{21} Article 32 of the CBA appears to be a self-contained treatment of the entire subject-matter of special assignments. Most importantly for the current dispute, Article 32 expressly provides that review by the City Manager is the final step in grievances arising from reassignments from specialty positions. If, for example, Mitchell and Martinez had been reassigned for a purely non-disciplinary reason—e.g., so that other officers would have the opportunity to benefit from the experience of serving on the Task Force—there likely would be little question that Chief McCloskey's decision to reassign was grievable, but not arbitrable, as provided by Article 32. Here, however, the reassignment can be viewed as either a reassignment or a disciplinary action. As previously noted, Chief McCloskey testified that had he been in Mitchell and Martinez's shoes he would have viewed the reassignment as discipline. A question therefore arises as to which procedure should control in the case of a reassignment from a speciality position imposed as discipline: Article 32, which provides that review by the City manager is the final step in grievances relating to reassignments from specialty positions; or Article 26. H, which

provides that "[d]isciplinary actions, other than verbal or written reprimands or warnings, may be appealed through the grievance procedure contained in [the CBA] through the process of arbitration."

{22} Plaintiffs' showing, which was limited to the CBA itself, was insufficient to demonstrate entitlement to summary judgment on the arbitrability of reassignments out of specialty positions. At trial, Plaintiffs would bear the burden under Subsection 201(2)(b) of establishing that (1) the Union had no reason to know of the City's understanding, and (2) the City had reason to know of the Union's understanding. Instead of conclusively ruling out the City's interpretation as unreasonable, the record before the district court merely established that either party's interpretation is reasonable when the CBA is viewed from the standpoint of a fair-minded reader. Where each party's interpretation is one to which the contract language is reasonably susceptible, each party has reason to know of the other's interpretation, and neither party can satisfy Subsection 2(b). Farnsworth, *supra*, § 7.9, at 509. In other words, contract language that is ambiguous—i.e., that is reasonably susceptible to either party's interpretation—cannot by itself eliminate genuine issues of material fact as to what each party had reason to know about the other party's understanding. Accordingly, Plaintiffs' showing, which was limited to the CBA, failed to make out a prima facie case of entitlement to summary judgment. The district court should have denied Plaintiffs' motion for summary judgment. *Young v. Thomas*, 93 N.M. 677, 679, 604 P.2d 370, 372 (1979) (determining as a matter of law that the parties' agreement demonstrated an ambiguity; reversing summary judgment and remanding case for consideration of extrinsic evidence to determine the intent of the parties at the time the agreement was made).

{23} On remand, the district court should hear "evidence of the circumstances surrounding the making of the [CBA] and of any relevant usage of trade, course of dealing, and course of performance." *C.R. Anthony Co. v. Loretto Mall Partners*, 112 N.M. 504, 508-09, 817 P.2d 238, 242-43 (1991). If, in the light of this evidence, no reasonable fact-

finder could determine what the Union and the City knew or should have known of the other's understanding "in any way but one," the district court may determine the parties' respective understandings as questions of law, and apply the standards of Restatement (Second) of Contracts § 201 accordingly. *See id.* at 510, 817 P.2d at 244. If, in the light of the extrinsic evidence, reasonable factfinders could disagree as to what the Union and the City knew or should have known of the other's understanding, the district court should treat the parties' respective understandings of the CBA as questions of fact,[2] and apply the standards of Restatement (Second) of Contracts § 201 to the facts so found. The district court should remain alert to the possibility that each party's understanding was reasonable under all the circumstances existing when the Union and the City entered into the CBA and that there was a failure of mutual assent. Restatement (Second) of Contracts § 201(3). We encourage the parties to request, and the district court to enter, findings of fact and conclusions of law consistent with the standards of Restatement (Second) of Contracts § 201.

{24} In the previous paragraph we have assumed that the parties will come forward with extrinsic evidence bearing upon what the Union and the City knew or should have known of the other's understanding.

> [I]n the event the parties do not offer evidence of the facts and circumstances surrounding execution of the agreement and leading to conflicting interpretations as to its meaning, the court may resolve any ambiguity as a matter of law by interpreting the contract using accepted canons of contract construction and traditional rules of grammar and punctuation.

*Mark V, Inc. v. Mellekas*, 114 N.M. 778, 782, 845 P.2d 1232, 1236 (1993). We emphasize that traditional canons of contract construction are merely "guides in the process of interpretation," Restatement (Second) of Contracts § 202 cmt. a (1981), and even when a court is construing a contract as a matter of law, it should remain alert to the possibility that a lack of clarity is an indication of a failure of mutual assent that cannot, and should not, be cured through strained or outcome-determinative application of judicial maxims.

{25} We offer the following remarks in response to Judge Pickard's dissent.

{26} We agree with the dissent that under *Barncastle* we arguably have the authority to go ahead and rule on the City's cross-motion. But to the extent the City's cross-motion asks us to declare that its proffered meaning controls, the City assumes the burden of persuasion, and therefore faces exactly the same problem that faced the Union: "contract language that is ambiguous—i.e., that is reasonably susceptible to either party's interpretation—cannot by itself eliminate genuine issues of material fact as to what each party had reason to know about the other party's understanding."

{27} We do not consider Hudson's references to the bargaining history as actual evidence of the bargaining history. Instead, we view Hudson's references merely as suggesting that such extrinsic evidence probably exists. Moreover, even if we accepted Hudson's references as evidence of the actual bargaining history, the bargaining history as described by Hudson does not squarely address the problem presented by a reassignment that also constitutes a disciplinary action. Thus, this is a case in which the court was asked to decide cross-motions for summary judgment based solely upon consideration of a record that of itself did not eliminate genuine issues of material fact as to what each party knew or should have known of the other's understanding.

{28} There is a means of breaking this apparent interpretative stalemate, but neither the district court nor the City relied on it. The key is the risk of non-persuasion. Plaintiffs are the parties seeking affirmative relief, and their right to relief depends upon their establishing that their proffered interpretation of the CBA controls. If Plaintiffs are unable to establish that their interpretation controls, their claim fails, and the extrajudicial status quo continues unaltered. As the party that does not bear the risk of non-persuasion, the City can win merely by demonstrating that Plaintiffs cannot meet their burden of persuasion on the record before the court. There is no need to take the

---

**2.** Neither party requested a jury trial.

additional step of deciding whether the City's interpretation should control in order to dispose of this case. Although we think that this is a relatively obvious point once it has been made, no prior case of which we are aware has expressly recognized the importance of allocating the risk of non-persuasion in ruling on cross-motions for summary judgment in a contract interpretation case. We are reluctant to grant summary judgment for the City without giving Plaintiffs and the district court an opportunity to address the consequences of our newly-clarified emphasis on the risk of non-persuasion in contract interpretation cases.

{29} For the reasons set forth above, we reverse the summary judgment in favor of Plaintiffs and remand for further proceedings consistent with this opinion.

{30} **IT IS SO ORDERED.**

I CONCUR: CYNTHIA A. FRY, Judge.

LYNN PICKARD, Judge (specially concurring in part and dissenting in part).

PICKARD, Judge (specially concurring in part and dissenting in part).

{31} I agree with the majority's determination that the trial court erred in granting summary judgment for Plaintiffs. Although I do not disagree with the majority's adoption in New Mexico of the Restatement (Second) of Contracts § 201 and the various out-of-state cases cited in the majority opinion, I have concerns about whether they apply to this case. I also disagree that this case should be remanded for further factual development. I would therefore remand with instructions to enter judgment for Defendants.

{32} With regard to the issue of whether the authorities relied on by the majority should be applied in this case, we do not ordinarily reach out to "decide [a] case on a theory not explored or argued by the parties on appeal." *Joslin v. Gregory*, 2003–NMCA–133, ¶ 8, 134 N.M. 527, 80 P.3d 464. Here, the parties did not cite or rely on any of these authorities, instead presenting the case as a simple one that could be decided with reference to New Mexico authorities. Each party contended that its reading of the contract should prevail as a matter of law based on the undisputed facts and the extrinsic evidence presented to the trial court as attachments to the summary judgment motions and responses. As stated by our Supreme Court, "[c]ourts risk overlooking important facts or legal considerations when they take it upon themselves to raise, argue, and decide legal questions overlooked by the lawyers who tailor the case to fit within their legal theories." *In re Doe*, 98 N.M. 540, 541, 650 P.2d 824, 825 (1982) (alteration in original) (internal quotation marks and citation omitted). Although this statement might not apply to the simple citing of different or more pertinent authority than that cited by the parties, it does apply to "ignor[ing] the arguments presented and search[ing] for an alternative ground for decision." *Id.* In this case, no party raised the relative burdens of proof in the context of summary judgment, and no party employed the analysis suggested by the Restatement or any similar analysis.

{33} Both parties moved for summary judgment, and both parties appeared to be of the belief that further extrinsic evidence would not be forthcoming and that the case could be decided, one way or the other, on the basis of the CBA, the bargaining history resulting in the compromise regarding specialty position personnel decisions, and the undisputed facts surrounding the events at issue. Plaintiffs claim that those events constituted a "demotion," while Defendants claim the events were "discipline" in the form of a "written reprimand" under Article 26(H) and a "reassignment" under Article 32, neither of which is arbitrable. In fact, Plaintiffs have never sought a trial at which they could present further extrinsic evidence, leading me to believe that such evidence does not likely exist. We have held that where the parties agree to have the trial court decide a case on cross-motions for summary judgment and where neither party claims that disputed facts exist, this Court will review the case as presented by the parties and decide it one way or the other. *See, e.g., Barncastle v. Am. Nat'l Prop. & Cas. Cos.*, 2000–NMCA–095, ¶ 5, 129 N.M. 672, 11 P.3d 1234. Here, both parties appear to have asked the trial court to interpret the CBA as a matter of law in view of the undisputed facts and uncontroverted evidence. Accordingly, we should decide the case on its merits, rather than remanding for additional factual development.

{34} Applying the majority's law to the facts developed during the proceedings on cross-motions for summary judgment, it is apparent that Plaintiffs have failed in their burden of opposing Defendants' motion for summary judgment. Plaintiffs, as the party seeking to alter the extrajudicial status quo, were required to show a reason for favoring their interpretation of the contract over Defendants' interpretation. At best, Plaintiffs showed only that the CBA was reasonably susceptible of more than one interpretation. Such a showing is insufficient to allow the party bearing the burden of persuasion to prevail. *See* Maj. Op. ¶ 16 (citing cases and stating, "where the meaning of a material contract term is in dispute a party seeking affirmative relief based upon its interpretation necessarily bears the burden of establishing that its interpretation controls").

{35} Because both parties indicated by filing for summary judgment that further factual development was not required, and because Plaintiffs failed to meet their burden, I would reverse the summary judgment in favor of Plaintiffs and remand with directions to enter summary judgment in favor of Defendants.