# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date:  February 9, 2016

**NO. 34,343**

**MARTIN BODLEY, as Personal Representative of the Estate of Carl D. Bodley, deceased, KEVIN BODLEY, and LONA GEARHART,**

Plaintiffs/Counter-Defendants/Appellants,

v.

**CHRISTOPHER DEREK GOLDMAN, f/k/a CHRISTOPHER BODLEY, and THERESA LINN BODLEY,**

Defendants/Counter-Plaintiffs/Appellees.

**APPEAL FROM THE DISTRICT COURT OF CIBOLA COUNTY**
**James Sanchez, District Judge**

Michael Schwarz
Santa Fe, NM

Gilbert Arrazolo
Albuquerque, NM

for Appellants

Law Office of Daymon B. Ely
Daymon B. Ely
Albuquerque, NM

Jaramillo │ Touchet, LLC
David J. Jaramillo
Maria E. Touchet
Albuquerque, NM

for Appellees

**OPINION**

**BUSTAMANTE, Judge.**

{1}     This case presents a dispute over the distribution of the proceeds of an action brought under the Wrongful Death Act, NMSA 1978, §§ 41-2-1 to -4 (1882, as amended through 2001). The decedent's brother—who acted as the personal representative for purposes of the wrongful death action—argues that the decedent's children are not entitled to any of the proceeds because they "abandoned" their father. The district court disagreed and granted summary judgment in favor of decedent's children. On appeal, the personal representative argues that disputed issues of material fact preclude summary judgment. We disagree and affirm.

**BACKGROUND**

{2}     Carl Bodley (Carl) was killed in a single-car rollover accident in 2010. At the time of his death, Carl was unmarried, having been divorced in 2003 after thirty-four years of marriage. He had two adult children from the marriage, Christopher Goldman (Christopher) and Theresa Bodley (Theresa) (collectively, Children). He was also survived by his siblings Martin Bodley (Martin), Kevin Bodley (Kevin), and Lona Gearhart (Lona) (collectively, Appellants).

{3}     Christopher was appointed the administrator under the Uniform Probate Code of his father's estate in January 2011. *See* NMSA 1978, §§ 45-1-101 to -404 (1975, as amended through 2011). In December 2011—in an entirely separate

proceeding—Martin was appointed the personal representative of Carl's estate for the purpose of pursuing a wrongful death claim under the Wrongful Death Act. The same month, Martin's attorneys, Gilbert Arrazolo and James B. Ragan, filed suit against Ford Motor Company for Carl's death. The suit was settled in January 2013. After subtracting their fees and expenses, the attorneys deposited the balance of the settlement funds in a trust account. Children assert that they were not notified of the filing or settlement of the wrongful death action when they occurred.

{4}    Over a year later, Arrazolo met with Theresa and presented her with a written agreement providing that, in exchange for twenty percent of the settlement amount, Theresa would agree "that [the agreement] is a full and final settlement of the proceeds in this case and hereby settles all her potential claims against Ford Motor Company, Martin Bodley, Gilbert Arrazolo and James Ragan." The agreement also stated that Arrazolo did not represent Theresa, that Theresa could obtain independent counsel, and that "technical[ly]" the Wrongful Death Act entitled Theresa to fifty percent of the settlement amount. However, it also stated that "case[]law suggests adjustments and/or disqualifications for abandonment/estrangement." Attached to the agreement were several New Mexico cases addressing recovery under the Wrongful Death Act. Theresa asserts that she first learned of the wrongful death claim and settlement with Ford at this meeting. The following week, Arrazolo presented the

2

same agreement and material to Christopher. Neither Theresa nor Christopher signed the agreement.

{5}     In April 2014, Appellants filed a complaint for declaratory judgment seeking to "determine the rights of statutory beneficiaries under the Wrongful Death [Act]." The premise of the complaint was that Christopher and Theresa had "abandoned the child-parent relationship and [were] not entitled to recover under the Wrongful Death Act" or that, alternatively, the settlement funds should be distributed in equal shares to Christopher, Theresa, and each of Carl's three siblings. As a factual basis for the complaint, Appellants alleged, inter alia, that (1) Christopher and Theresa did not visit their father in the decade prior to his death, (2) neither Christopher nor Theresa attended Carl's funeral service, (3) Christopher told his father to "fuck off" after Carl indicated he wanted to have a relationship with Christopher, and (4) Christopher changed his last name and that of his son from Bodley to Goldman shortly after his parents' divorce, which "shows that not only did he never want anything to do with his father[, h]e also didn't want future generations to have anything to do with his father."

{5}     Children filed an answer, as well as a counterclaim against Martin and the other siblings for malicious abuse of process and prima facie tort, and a third-party complaint against the siblings' counsel for disgorgement, breach of fiduciary duty,

malicious abuse of process, and prima facie tort.[1] Children then moved for summary judgment on the declaratory judgment action, arguing that the Wrongful Death Act provides a clear structure for disbursement to beneficiaries that does not depend on whether the named beneficiaries were or were not estranged from the decedent. They maintained that, under the Wrongful Death Act, Appellants were entitled to the wrongful death proceeds only "if there is no . . . child or grandchild" of the decedent. *See* § 41-2-3(C), (E).

{6}     The district court granted Childrens' motion for summary judgment and entered orders to the effect that Appellants were not entitled to any of the proceeds of the settlement with Ford and that Children were entitled to the settlement funds remaining in the trust account. Appellants timely appealed.

**DISCUSSION**

{7}     Summary judgment is appropriate where there "is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Rule 1-056(C) NMRA. "[It] is a drastic remedy to be used with great caution." *Pharmaseal Labs., Inc. v. Goffe*, 1977-NMSC-071, ¶ 9, 90 N.M. 753, 568 P.2d 589. "[S]ummary judgment is improper, if, after resolving all reasonable doubts in favor of the opponent, the evidence adduced by the pleadings, depositions, answers to

---

[1]The counterclaim and third-party claims were later dismissed.

4

interrogatories, admissions on file, and affidavits shows that there was a genuine issue as to any material fact." *Id.* The substantive law governing the dispute determines which facts are material. *Farmington Police Officers Ass'n Commc'n Workers of Am. Local 7911 v. City of Farmington*, 2006-NMCA-077, ¶ 17, 139 N.M. 750, 137 P.3d 1204. "An issue of fact is 'material' if the existence (or non-existence) of the fact is of consequence under the substantive rules of law governing the parties' dispute." *Martin v. Franklin Capital Corp.*, 2008-NMCA-152, ¶ 6, 145 N.M. 179, 195 P.3d 24. Our review of summary judgment is de novo. *Id.*

{8} The Wrongful Death Act, the substantive law applicable here, provides:

> The proceeds of any judgment obtained in any such action . . . shall be distributed as follows:
>
> . . . .
>
> C.  if there is no husband or wife, but a child or grandchild, then to such child and grandchild by right of representation;
>
> . . . .
>
> E.  if there is no father, mother, husband, wife, child or grandchild, then to a surviving brother or sister if there are any[.]

Section 41-2-3.

{9} The parties clearly dispute whether Christopher and Theresa "abandoned" their father. The question is whether this dispute precludes summary judgment. While Children "strongly disagree with [Appellants'] categorization of their relationship

5

with their father as 'abandonment' or 'estrangement,' " they argue that the veracity of Appellants' allegations is immaterial because "[w]hether or not [Children] 'abandoned' their father is not a 'material fact' because it does not change the statutorily-mandated distribution scheme." Appellants counter that this Court must construe the facts in the light most favorable to them and that, under that construction, Christopher and Theresa clearly did not support Carl. *Barber's Super Mkts., Inc. v. Stryker*, 1970-NMSC-027, ¶ 7, 81 N.M. 227, 465 P.2d 284 ("A party opposing a motion for summary judgment is entitled to have all reasonable inferences construed in a light most favorable to him.").

{10}     We interpret Appellants' argument to be that whether Christopher and Theresa abandoned Carl is a disputed material fact under the Wrongful Death Act because (1) adult children have a common-law duty to "at least provid[e] emotional support" to their parents, (2) New Mexico case law prevents beneficiaries who are estranged from their decedent from recovering proceeds of a wrongful death claim, and (3) the Legislature did not intend the Wrongful Death Act to provide a windfall to adult children who abandoned their decedent parent. The crux of the question before us is whether the Wrongful Death Act's distribution scheme may be altered when the relationship between a decedent and his or her children has deteriorated—or perhaps even evaporated. In other words, assuming that Appellants' allegations are true,

6

should Christopher and Theresa be denied some or all of the proceeds of the Wrongful Death Act claim? Appellants' arguments rely in large part on this Court's opinion in *Perry v. Williams* and we begin with a discussion of that case. 2003-NMCA-084, 133 N.M. 844, 70 P.3d 1283.

{11} Perry (Mother) and Williams (Father) were the natural parents of Curtis, who died from leukemia at the University of New Mexico (UNM) Hospital in 1986 while still a minor. *Id.* ¶ 2. In May 2000 Perry obtained a settlement of $463,332 from UNM Hospital under the Wrongful Death Act. *Id.* Shortly thereafter, Perry petitioned for termination of Williams' parental rights and for a declaration that Williams had no right to the settlement funds because he had abandoned and neglected Curtis. *Id.* ¶ 3. Williams apparently did not contest the district court's findings that Williams "utterly failed to meet the responsibilities of a father during Curtis['s] lifetime," *id.* ¶ 6, because Williams (1) "paid less than a total of $200 as child support" throughout Curtis's life in spite of numerous court orders requiring child support; (2) did not visit Curtis in Albuquerque except for at the time of Curtis's death; (3) "had no contact with Curtis from age two until just days before his death" except for two visits in California initiated by Perry and the paternal grandfather; and (4) "did not write, did not call, did not send cards or gifts" while Curtis was hospitalized four times and "failed to cooperate in the necessary testing for a bone marrow transplant although

he was asked to do so" and "was one of only three possible donors." *Id.* ¶ 5. Instead, similar to Children here, Williams argued that "there was no basis in law to terminate his statutory right to benefits pursuant to the Wrongful Death Act." *Id.* ¶ 3.

{12} After first observing that there was a nationwide "consensus that it is bad policy to permit parents who have deserted or abandoned their children to recover for the wrongful death of those children[,]" *id.* ¶ 13, we proceeded to examine the common law as it existed when the Wrongful Death Act was enacted, observing that "it is the common law . . . that establishes the baseline for our analysis." *Id.* ¶ 17. Under the common law, "the right of a parent to the services of the child or the child's earnings was linked to the parent's actual support of the child." *Id.* ¶ 18. This Court concluded that "[w]e do not lightly assume that the [L]egislature intended to alter this common law principle when it enacted the Wrongful Death Act. To the contrary, we believe that the [L]egislature intended to incorporate this common law principle into the Act when it was passed." *Id.* ¶ 20.

{13} Next, the Court examined New Mexico public policy as evinced in statutes addressing parental responsibilities to children. *Id.* ¶¶ 21-22. It concluded that a variety of statutes indicate that New Mexico "disfavors natural parents who do not acknowledge their responsibilities to their children." *Id.* ¶ 21 (internal quotation marks and citation omitted). These statutes include, among others, the Support

Enforcement Act, NMSA 1978, §§ 40-4A-1 to -20 (1985, as amended through 2004), the Parental Responsibility Act, NMSA 1978, §§ 40-5A-1 to -13 (1995, as amended through 2015), and certain provisions of the Probate Code, NMSA 1978, § 45-2-114(C) (2011). *Perry*, 2003-NMCA-084, ¶ 21.

{14}    Finally, the Court noted that case law indicated that "statutory wrongful death benefits have been determined by common law principles." *Id.* ¶ 24 (citing *Baca v. Baca*, 1963-NMSC-043, ¶ 23, 71 N.M. 468, 379 P.2d 765; *Sanchez v. J. Barron Rice, Inc.*, 1967-NMSC-077, ¶ 4, 77 N.M. 717, 427 P.2d 240; and *Latimer v. City of Clovis*, 1972-NMCA-040, ¶ 46, 83 N.M. 610, 495 P.2d 788). In the cases cited, the "contributory negligence of one of the beneficiaries under the Wrongful Death Act defeat[ed] the right of recovery to the extent of that party's share." *Perry*, 2003-NMCA-084, ¶ 24. The Court also pointed to *Wasson v. Wasson*, 1978-NMCA-092, ¶ 15, 584 P.2d 713, for the proposition that parental rights should be terminated when the parent has abandoned the child, except where termination would negatively affect the child's rights vis-à-vis the parent. *Perry*, 2003-NMCA-084, ¶ 26. Thus, the *Wasson* Court refused to terminate the father's parental rights because to do so would extinguish the child's right to inherit from the father or recover under the Wrongful Death Act, although it observed that if the child's right to inherit was not divested

through parental termination, it would otherwise favor termination. *Perry*, 2003-NMCA-084, ¶ 26.

{15} Based on the common law underpinnings of the Wrongful Death Act, the public policy indicated in statutes, and the application of common law principles to wrongful death benefits in other contexts, we concluded in *Perry* that it was consistent with the legislative intent behind the Wrongful Death Act to permit "a personal representative in a wrongful death action [to] present evidence of abandonment and non-support, and even seek to terminate [a parent's] parental rights, particularly in light of the fact that the only remaining one is a right to recover money." *Id.* ¶¶ 16, 28 (internal quotation marks and citation omitted); *see In re Estate of Sumler*, 2003-NMCA-030, ¶ 33, 133 N.M. 319, 62 P.3d 776; *Dominguez v. Rogers*, 1983-NMCA-135, ¶ 20, 100 N.M. 605, 673 P.2d 1338, *superceded by statute on other grounds as stated in Spoon v. Mata*, 2014-NMCA-115, 338 P.3d 113.

{16} In an echo of the reasoning in *Perry*, Appellants first argue that the Wrongful Death Act incorporates the common law principle that "adult children have the legal duty to support their parents." They point to the Elizabethan Poor Laws, which were passed in 1601 and, they argue, incorporated into the common law of New Mexico. **[BIC 6]** *See* Robin M. Jacobson, Note, *Americana Healthcare Center v. Randall: The Renaissance of Filial Responsibility*, 40 S.D.L. Rev. 518, 527 (1995) (discussing the

Poor Laws).[2] Filial responsibility laws such as the Poor Laws were predicated on protection of the indigent as well as the public fisc. Jacobson, *supra*, at 527 (stating that "[t]he purpose of the Poor Laws was to relieve the general public from supporting indigent persons whose relatives had the ability to contribute to their support"); Christina Lesher et. al., *Whose Bill Is It Anyway? Adult Children's Responsibility to Care for Parents*, 6 Est. Plan. & Cmty. Prop. L.J. 247, 249 (2014) (stating that the Poor Laws were "based on a theory that relatives were the first and primary source of aid to the indigent, and government assistance was merely a secondary source"); Seymour Moskowitz, *Filial Responsibility Statutes: Legal and Policy Considerations*, 9 J.L. & Pol'y 709, 711 (2001) ("The overarching principles of the Elizabethan '[P]oor [L]aws' dictated that blood relatives were the primary source of support for family members, including the elderly, but that public assistance

---

[2]Jacobson quotes the statute as follows:

[The parents, grandparents, and the children of] everie poore olde blind lame and impotente person, or other poore person not able to worke, beinge of sufficient abilitie, shall at their owne Chardges releive and maintain everie suche poore person, in that manner and according to that rate, as by the Justices of the Peace of that Countie where suche sufficient persons dwell, or the greater number of them, at their generall Quarter-Sessions shalbe assessed; upon paine that everie one of them shall forfeite twenty shillings for everie monthe which they shall faile therein.

*Id.* n.94; *see* The Poor Relief Act, 1601, 43 Eliz. 1, c. 2, § 6.

was available for those unable to sustain themselves with private resources."). Notably, they did not require that adult children financially contribute to their parents if the parents were self-supporting, nor did they require adult children to visit, communicate with, admire, love, respect, obey, or otherwise emotionally support their parents.

{17} Here, Appellants' complaint alleges that Christopher and Theresa "abandoned their child-parent relationship" based on their failure to visit Carl, communicate with Carl, invite Carl to Christopher's wedding, attend Carl's funeral, or ask about Carl's ashes. None of these behaviors falls within the reach of the common law as addressed by the Poor Laws. Moreover, Appellants do not allege that Carl was indigent or dependent on government benefits. Thus, even if we assume without deciding that the Poor Laws were adopted by New Mexico and imposed a duty to provide financial support on adult children, we conclude that Appellants have not even alleged, much less shown, that that duty was breached here. *Wallace v. Blanchard*, 1920-NMSC-019, ¶ 21, 26 N.M. 181, 190 P. 1020 (stating that "these [P]oor [L]aws were local to England, and no state, so far as we are aware, has ever held that by the adoption of the common law such [P]oor [L]aws were introduced into the adopting state").

{18} Appellants next argue that the holding in *Perry* applies here and requires reversal. They also argue that it is unfair to permit "ungrateful adult children who

12

have abandoned their parents to pursue their own self[-]interests" to recover a "windfall" through the Wrongful Death Act and that Christopher and Theresa "are no different than the greedy father in *Perry*." In essence, Appellants ask that we simply apply the responsibilities of parents addressed in *Perry* to adult children. But the *Perry* holding was based on an analysis of legislative intent relevant to *child* welfare. *Perry* rested on the Court's conclusion that the Legislature incorporated a duty found in the common law into the Wrongful Death Act and also intended that public policy embodied in other statutes would apply to the distribution of benefits. We have already determined that Appellants have not alleged a breach of a common law duty to financially support indigent parents, if there is one. Appellants also do not identify any statutes indicating that it is public policy in New Mexico to require adult children to support their parents. The closest statute we uncovered is a filial responsibility law passed in 1955. 1955 N.M. Laws, Spec. Sess. ch. 3, §§ 1-7. That statute provided that

> [e]very child in the state who has reached his seventeenth birthday shall support or contribute to the support of his parent or parents if: 1) the parent is unable to support himself and is, or is about to become a public charge, and 2) the child is financially able to furnish partial or complete support.

*Id.* § 1.

{19} The statute was codified as NMSA 1953, §§ 13-1-45 to -50. Like the Poor Laws, this statute clearly requires only financial support. For example, it directs the

13

department of public welfare to "prepare and publish scales based on the income and primary obligations of the children [to be used] in determining the extent and minimum amount of support recipients are entitled to receive from their children." 1955 N.M. Laws, Spec. Sess. ch. 3, § 3. In 1957, the statute was amended to include a scale of monthly payments to parents based on the adult child's income. 1957 N.M. Laws, ch. 184, §§ 1-2. The statute does not mention any kind of support other than financial. Moreover, even this statute was repealed in its entirety in 1967. 1967 N.M. Laws, ch. 46, § 1 and ch. 109, § 1. Hence, there is no New Mexico statutory authority indicating a public policy requiring adult children to support their parents, either financially or emotionally. *See generally* Katherine C. Pearson, *Filial Support Laws in the Modern Era: Domestic & International Comparison of Enforcement Practices for Laws Requiring Adult Children to Support Indigent Parents*, 20 Elder L.J. 269, 304 (2013) (table showing which states have filial support laws and indicating no such statute in New Mexico); Lesher, *supra*, at 250-51 (stating that "thirty state codes currently include [filial responsibility] laws" and noting that they are rarely enforced). The lack of such authority distinguishes the analysis here from that in *Perry*. Appellants have failed to provide any authority for the proposition that adult children have responsibilities to their parents corresponding to those of parents to their children. In the absence of such authority, *Perry* is inapplicable here.

**CONCLUSION**

{20}     We conclude that, even if adult children have a common law duty to financially support their parents, Appellants have not alleged conduct breaching that duty. In addition, there is no statutory authority indicating that the Legislature intended to alter the distribution scheme in the Wrongful Death Act based on adult childrens' abandonment of their decedent parent. Consequently, the dispute over whether Christopher and Theresa failed to emotionally support their father is immaterial to the distribution of benefits under the Wrongful Death Act. The district court's grant of summary judgment is affirmed.

{21}     **IT IS SO ORDERED.**

_____

**MICHAEL D. BUSTAMANTE, Judge**

**WE CONCUR:**

_____

**JAMES J. WECHSLER, Judge**

_____

**LINDA M. VANZI, Judge**

15