2003-NMCA-084

70 P.3d 1283

**Wanda PERRY, Petitioner–Appellee,**

v.

**Zollie Jeffrey WILLIAMS, Respondent–Appellant.**

**No. 22,664.**

Court of Appeals of New Mexico.

May 6, 2003.

Certiorari Denied, No. 28,085, June 33, 2003.

Edward L. Chávez, David J. Stout, Carpenter & Chávez, Ltd., Albuquerque, NM, for Appellee.

Bradley D. Tepper, Miller, Stratvert & Torgerson, P.A., Albuquerque, NM, Megan M. Kelley, Hamilton and Faatz, P.C. Denver, CO, for Appellant.

*OPINION*

PICKARD, Judge.

{1} This is an appeal of the trial court's determination that Appellant, Zollie Jeffrey Williams (Father), is barred from claiming the father's share of benefits pursuant to the Wrongful Death Act, NMSA 1978, § 41–2– 3(D) (1882, as amended through 2001). We affirm the ruling of the trial court.

**FACTS AND PROCEDURAL HISTORY**

{2} This is a case with an unusual set of facts that proceeded through the trial court in an unusual way. The case began in June 2000, when Father was served with a summons and petition to terminate his parental rights fourteen years after his son had died. Father and Appellee, Wanda Perry (Mother), are the natural parents of Curtis, who died from leukemia at the University of New Mexico Hospital in April 1986. Pursuant to a wrongful death claim against the hospital, Mother obtained a settlement in May 2000, the net proceeds of which, totaling approximately $463,332, are at the heart of the dispute between Father and Mother.

{3} Following this Court's suggestion in *Dominguez v. Rogers,* 100 N.M. 605, 609, 673 P.2d 1338, 1342 (Ct.App.1983), Mother petitioned the trial court to terminate Father's parental rights and later amended her petition to include a request for a declaration that Father had no statutory right to the settlement money or, in the alternative, for equitable apportionment of the settlement because of Father's abandonment and neglect of his son. In response, Father filed a motion pursuant to Rule 1–012(B)(6) NMRA 2003, stating that there was no basis in law to terminate his statutory right to benefits pursuant to the Wrongful Death Act. In an amended motion, he argued that termination of parental rights is not an appropriate action in which to distribute statutory benefits, and that a declaratory judgment or equitable apportionment was improper, because the Wrongful Death Act is the sole basis for distributing wrongful death benefits. He asserted that the Wrongful Death Act allowed no apportionment such as requested by Mother.

{4} The trial court ordered the attorneys to file legal memoranda addressing whether a private party could move to terminate parental rights absent a pending adoption and later informed the attorneys that it would attempt to rule on the briefs before it held a hearing on the Rule 1–012(B)(6) motion. Father never filed an answer to Mother's petition because he was waiting for a ruling on

his Rule 1–012(B)(6) motion. *See* Rule 1–012(A) (stating that service of a Rule 1–012(B) motion alters time for filing responsive pleading). However, the parties filed briefs in support of or opposition to the Rule 1–012(B)(6) motion, outlining their legal and factual arguments about the gravamen of the case: whether or not Father is entitled to statutory benefits pursuant to Section 41–2–3(D). The trial court issued a letter to the attorneys saying that the legal question to be decided was whether this Court's dicta in *Dominguez* would be adopted as a holding, and the factual question to be decided was whether Father abandoned his child. The trial court determined that discovery could proceed in anticipation of a hearing, which was held in August 2001.

{5} After the hearing, the trial court issued a letter ruling. The court specifically found:

3. Throughout Curtis' life and [his sister's] minority status, [Father] paid less than a total of $200 as child support, notwithstanding that he was brought before courts in New Mexico and California numerous time[s] and found to be able to pay and held to be in wilful non-compliance with court orders.

4. From the date of divorce [in 1973] until Curtis' death in April 1986, the only time [Father] traveled to Albuquerque to visit the children was at the time of Curtis' death, even though his parents, the paternal grandparents (who did maintain contact with the children) were residents of Albuquerque.

5. On one occasion the children and their mother traveled to California, where [Father] lived, to visit Disneyland, and while there, made contact with [Father]. On another occasion the paternal grandfather, who was a long-distance truck driver, took Curtis on a road trip to California, and while there, made contact with [Father]. Other than these visits, [Father] had no contact with Curtis from age two until just days before his death. Nor did [Father] telephone or write to Curtis, or even send gifts or cards. [Curtis' sister] was treated likewise.

6. When Curtis was diagnosed with cancer in 1985, his mother arranged for [Father] to be informed. Curtis was hospitalized five times until his death in April 1986. During the first four hospitalizations, [Father] did not visit, did not write, did not call, did not send cards or gifts. Additionally, [Father] failed to cooperate in the necessary testing for a bone marrow transplant although he was asked to do so, and told he was one of only three possible donors (the other two being Curtis' mother and sister, neither of whom matched). Only upon being told that Curtis' death appeared imminent did [Father] travel to Albuquerque to visit just days or hours before the child died.

{6} The trial court's letter ruled, pursuant to *Dominguez*, that

(1) because [Father] utterly failed to meet the responsibilities of a father during Curtis Williams' lifetime, [Father] is equitably estopped from claiming that status in this or any court proceeding in his attempt to claim a share of the wrongful death benefits, and (2) because [Father] flagrantly violated court orders as to child support, both in New Mexico and California, [Father] is equitably estopped from seeking court assistance in his attempt to claim a share of the wrongful death benefits.

Though the trial court did not actually terminate Father's parental rights, the court's letter did say:

If it is necessary as a matter of law to terminate [Father's] parental rights to prevent him from participating in Curtis Williams' wrongful death benefits, his parental rights should be terminated.

If it is necessary as a matter of law to declare [Father] ineligible as a statutory beneficiary or recipient to prevent him from participating in Curtis Williams' wrongful death benefits, his status as a statutory beneficiary should be terminated.

The trial court then issued an order and judgment denying Father's motions to dismiss pursuant to Rule 1–012(B)(6), incorporating in the order the findings and conclusions from its letter ruling. The trial court ordered, adjudged, and decreed that Father was barred from seeking any portion of the

settlement and that Mother was entitled to the full amount.

{7} Father appeals this ruling, arguing essentially that there is no basis in law for the trial court's ruling.

## DISCUSSION

{8} Father argues that this case is purely a matter of interpreting and applying provisions of the Wrongful Death Act. He argues that we need only consider the facts of who the minor's parents are in order to determine how a settlement is distributed. Therefore, Father asserts, the trial court erred in considering factors such as abandonment and non-support in disqualifying him from receiving his statutory portion of the wrongful death settlement. He argues that the rights conferred in the Wrongful Death Act are statutory in nature, are in derogation of common law, and must be strictly construed, lest the courts intrude upon the province of the legislature. He also makes the related legal argument that posthumous termination of his parental rights is unsupported by any legal authority and cannot be proven under any set of facts, so his Rule 1–012(B)(6) motion should have been granted. Insofar as the trial court used the language of equitable estoppel in its letter ruling, Father argues that equitable estoppel was neither pleaded, tried, nor proved. Finally, Father argues that the trial court erred in failing to use the standard of proof of clear and convincing evidence explicitly in its ruling.

{9} Mother contends that there are circumstances in which our common law can abrogate the Wrongful Death Act, and that the view expressed in *Dominguez* controls in this instance, particularly because the trial court determined that the facts showed "clear and obvious physical, emotional, economic, and medical abandonment" by Father. Mother does not defend the trial court's use of equitable estoppel language, arguing instead that the trial court can be affirmed if it is right for any reason. *See, e.g., Meiboom v. Watson,* 2000–NMSC–004, ¶ 20, 128 N.M. 536, 994 P.2d 1154. Mother also contends that clear and convincing evidence is not the standard, but if it is, the trial court's ruling was supported by clear and convincing evidence in that the trial court found the evidence to be "clear and obvious," the evidence was undisputed, and Father does not challenge the factual findings in any event.

{10} Our task in this case is to determine whether the language in *Dominguez* correctly states the law. In doing so, we strive to implement the Wrongful Death Act in the manner intended by the legislature. We do so against a backdrop of the New Mexico common law, as well as the common law and statutes from other jurisdictions. In addition, we have a wealth of recent statutory changes that express our legislature's view on the public policy issues raised by this case. Our holding that *Dominguez* is well supported and consistent with legislative intent is sufficient for us to affirm the trial court's ruling barring Father's recovery on the facts of this case, which are undisputed and unchallenged. Thus, we need not address in detail Father's arguments about equitable estoppel, clear and convincing evidence, or posthumous or nonstatutory termination of parental rights.

{11} In particular, this case does not require us to reach the question of whether New Mexico law allows a private party to bring a petition to terminate parental rights to a deceased child. A formal termination of Father's parental rights is unnecessary because the trial court clearly had jurisdiction over Mother's amended petition pursuant to the Declaratory Judgment Act, NMSA 1978, §§ 44–6–1 to –15 (1975), to declare Father's "rights, status or other legal relations" arising under the Wrongful Death Act. Section 44–6–4. Because we are dealing with the extinguishment of Father's property interest in a statutory right of recovery that was not a traditional incident of the parent-child relationship, there is no reason to employ the heightened burden of proof applicable to formal termination of parental rights proceedings.

### Standard of Review

{12} The issues raised by the parties in this case are primarily, if not exclusively, legal issues. We review legal issues de novo. *Gabaldon v. Erisa Mortgage Co.,* 1997–NMCA–120, ¶ 6, 124 N.M. 296, 949 P.2d 1193, *aff'd in part, rev'd in part on other*

*grounds,* 1999–NMSC–039, 128 N.M. 84, 990 P.2d 197. To the extent that we review the trial court's findings and conclusions, we are deferential to facts found by the trial court, but review conclusions of law de novo. *Strata Prod. Co. v. Mercury Exploration Co.,* 1996–NMSC–016, 121 N.M. 622, 627, 916 P.2d 822, 827.

### Nationwide Backdrop

■ {13} Among the states that have decided this issue, there is a consensus that it is bad policy to permit parents who have deserted or abandoned their children to recover for the wrongful death of those children.

The overwhelming weight of authority is that a parent's desertion or abandonment or failure to support his minor child precludes recovery of damages for the wrongful death of such child. In the majority of cases such result has been expressly provided for by statute, the sole inquiry being whether the exclusionary condition of desertion, abandonment, or failure to support existed. In the few cases where such result has been reached other than by the application of a statutory provision barring a parent's right of recovery on the grounds of desertion, abandonment, or failure to support, the courts have reasoned that the parent, by his conduct, had forfeited his right to the child's services and thus could not have suffered any pecuniary loss by reason of the death.

Emile F. Short, Annotation, *Parent's Desertion, Abandonment, or Failure to Support Minor Child as Affecting Right or Measure of Recovery for Wrongful Death of Child,* 53 A.L.R.3d 566, 569–70, 1973 WL 33957 (1973) (footnotes omitted).

### The Statute and Legislative Intent

{14} New Mexico's wrongful death statute is not like those found in the majority of cases in that it does not expressly provide that desertion, abandonment, or failure to support precludes recovery for wrongful death. Thus, Father argues that a strict, verbatim construction of Section 41–2–3 does not allow an examination into factors that would permit a court to bar a named beneficiary from receiving wrongful death benefits.

He also argues that, as a general proposition, statutes cannot be abrogated by common law. *See Patterson v. Globe Am. Cas. Co.,* 101 N.M. 541, 544, 685 P.2d 396, 399 (Ct.App. 1984) ("[W]hen a right is created which did not exist at common law and for that right a remedy is by statute prescribed, the whole matter of right and remedy is within the statute and no part of either otherwise exists."), *superseded by statute on other grounds as stated in Journal Publ'g Co. v. Am. Home Assurance Co.,* 771 F.Supp. 632, 635 (S.D.N.Y.1991).

■ {15} However, examination of the common law as it existed at the time of the legislature's enactment of the Wrongful Death Act casts grave doubt on the premise of Father's argument, i.e., that the Act clearly allows him to recover. In addition, we are to exercise caution when asked to read statutes literally. *See State ex rel. Helman v. Gallegos,* 117 N.M. 346, 351–54, 871 P.2d 1352, 1357–60 (1994). Our aim in applying statutes is to ascertain and conform to what our legislature intended, and in doing so, we reject formalistic and mechanistic interpretations of statutes. *See D'Avignon v. Graham,* 113 N.M. 129, 131, 823 P.2d 929, 931 (Ct.App. 1991). To the extent that Father relies on the legislature's inaction regarding the wrongful death statute over the years intervening between *Dominguez* and now, we are reminded that " '[l]egislative silence is at best a tenuous guide to determining legislative intent.' " *State Farm Mut. Auto. Ins. Co. v. Progressive Specialty Ins. Co.,* 2001–NMCA–101, ¶ 17, 131 N.M. 304, 35 P.3d 309 (quoting *Swink v. Fingado,* 115 N.M. 275, 283, 850 P.2d 978, 986 (1993)). Moreover, for the reasons that follow, we think that such silence is more likely an indication that the legislature has no disagreement with the language in *Dominguez.* As we discuss in this opinion, the legislature has not seen fit to amend the Wrongful Death Act in the face of Supreme Court cases potentially narrowing beneficiary status by application of common law principles, and the legislature has passed a host of other statutes expressing a policy adverse to parents who desert, abandon, or fail to support their children. We believe that these actions are more telling and lead

to our adoption of the dicta in *Dominguez* as our holding in this case.

### Dominguez

{16} In *Dominguez*, we stated that "[p]roof of natural-parent status is not necessarily sufficient for recovery under the wrongful death statute." 100 N.M. at 609, 673 P.2d at 1342. Though *Dominguez* did not reach the issue of whether the father could recover under the Wrongful Death Act, we warned future litigants that this Court "would take a narrow view of a self-interested individual who chooses to assert a parental status only when it becomes financially profitable to him following the death of a small child." *Id.* We suggested that a personal representative in a wrongful death action may present evidence of abandonment and non-support, and even seek to terminate the father's parental rights, "particularly in light of the fact that the only remaining one is a right to recover money." *Id.* This Court reaffirmed that sentiment in a recent decision, *In re Estate of Sumler*, 2003–NMCA–030, ¶ 33, 133 N.M. 319, 62 P.3d 776, when we stated that "[w]e do not retreat from the sentiments expressed in *Dominguez*." In *Sumler* we followed the *Dominguez* language, but found no voluntary abandonment on the part of the father. *Sumler*, 2003–NMCA–030, ¶ 33, 133 N.M. 319, 62 P.3d 776.

### Common Law Underpinnings

{17} Neither *Dominguez* nor *Sumler* contained any reasoned explanation of the language or sentiments expressed therein. Therefore, the question we must address in this case is whether the language in those cases is soundly supported. We begin our analysis with an examination of the common law's treatment of parents who abandon their children. In our view, it is the common law, and not the Wrongful Death Act as argued by Father, that establishes the baseline for our analysis.

{18} Under the common law, the right of a parent to the services of the child or the child's earnings was linked to the parent's actual support of the child. *See* 67A C.J.S. *Parent & Child* § 107 (1978); XXIX Cyclopedia of Law and Procedure, *Parent and Child*, § (V)(D), at 1627–28 (1908). In *Evans v. Kansas City Bridge Co.*, 213 Mo.App. 101, 247 S.W. 213 (1923), the court canvassed the authorities and said:

> At common law, the father is entitled to the services and earnings of his minor children, because he is bound to support and educate them. The right grows out of the obligation and is correlative to it. When one ceases, the other ceases also. . . . The right to the child's earnings arises out of the duty to support the child, and where the parent neglects that duty, or voluntarily releases his parental control to a third person, he loses the right to the child's earnings.

*Id.* at 214 (citations and internal quotation marks omitted). Similarly, in the more recent case of *Flippin v. Jarrell*, 301 N.C. 108, 270 S.E.2d 482, 490 (N.C.1980), the court cited a host of both older and more modern cases to a like effect.

{19} In a case presenting the opposite factual pattern, i.e., a child seeking to enforce an agreement or decree requiring a father to keep in force a life insurance policy even though the father had consented to the child's adoption and no longer was required to support the child, our Supreme Court said, "[a] parent's duty to support his child is interlocked with his right to enjoy and see to and know of the acceptance and use of the support furnished." *In re Quantius' Will*, 58 N.M. 807, 818, 277 P.2d 306, 313 (1954). Thus, too, "[t]he right of the parents is not an absolute right of property, but is in the nature of a trust reposed in them, and is subject to their correlative duty to care for and protect the child; *and the law secures their right only so long as they shall discharge their obligation.*" *Wallace v. Blanchard*, 26 N.M. 181, 188, 190 P. 1020, 1023 (1920) (emphasis added and internal quotation marks and citations omitted).

{20} With one exception, our Wrongful Death Act has substantially been in its present form for over one hundred years. In 1939, the legislature amended the Act, adding the language that is at the heart of this case, which expressly provides that the surviving "father and mother" of a deceased minor child can be the beneficiaries of an

action for the child's wrongful death. 1939 N.M. Laws ch. 105, § 1. It is quite clear to us that the sentiments expressed in *Dominguez* and *Sumler* are well grounded in the legislative history of the Wrongful Death Act and in the common law principle that the rights of parents and children are interlocked and that a parent may lose his or her right to benefit from a child if that parent abandoned the child. We do not lightly assume that the legislature intended to alter this common law principle when it enacted the Wrongful Death Act. To the contrary, we believe that the legislature intended to incorporate this common law principle into the Act when it was passed.

### New Mexico Public Policy

{21} The sentiments of *Dominguez* and *Sumler* are also supported by current public policy in New Mexico, which "disfavors natural parents who do not acknowledge their responsibilities to their children." *Sumler*, 2003–NMCA–030, ¶ 32, 133 N.M. 319, 62 P.3d 776. For example, the Support Enforcement Act outlines provisions to collect child support, including the withholding of income and the issuing of liens against real and personal property. NMSA 1978, §§ 40–4A–1 to –19 (1985, as amended through 1997). The Support Enforcement Act also recognizes remedies provided by other laws, Section 40–4A–16, and imposes penalties for non-compliance, including fines and actions for contempt of court. Section 40–4A–11. The Parental Responsibility Act provides that persons not in compliance with judgments and orders relating to paternity and child support may not obtain business, occupational, driver's, and other licenses and may have a current license suspended for non-compliance. NMSA 1978, §§ 40–5A–1 to –13 (1995, as amended through 1998). Our law also provides for agency procedures to order support or require work from persons owing past-due child support in the event the child is receiving state benefits. NMSA 1978, § 27–1–12 (1997). The Human Services Department may issue liens against gambling winnings of a parent owing child support payments. NMSA 1978, § 60–2E–61 (2002). The Probate Code prohibits a natural parent from inheriting through a child if that parent has not openly treated the child as the parent's own and has refused to support the child. NMSA 1978, § 45–2–114(C) (1993).

{22} It is therefore readily seen that New Mexico does not look favorably upon parents who do not support their children, and it does not allow those parents to profit through probate from a child's death. Our sentiments expressed in *Dominguez* and *Sumler*, that would prevent a parent who failed to support the child during the child's life from benefitting from a wrongful death recovery, are in keeping with New Mexico's public policy, which seeks to ensure that all natural parents support their children, and punishes parents when they do not. Those sentiments are also in keeping with the policy expressed in the Probate Code which prevents a non-supporting parent from inheriting from an abandoned child.

{23} Father argues that, by negative inference, the legislature's failure to amend the Wrongful Death Act to include a forfeiture provision similar to the one in the Probate Code suggests that the legislature did not intend to create such a provision. To the contrary, however, we believe that an inference of legislative acquiescence in our *Dominguez* decision is equally, if not more strongly, supported. Our examination of the common law underpinnings of our *Dominguez* decision above and our discussion of related New Mexico law below bears this out.

### Related New Mexico Law

{24} There are other instances in New Mexico when statutory wrongful death benefits have been determined by common law principles. Our Supreme Court has determined that contributory negligence of one of the beneficiaries under the Wrongful Death Act defeats the right of recovery to the extent of that party's share. *See Baca v. Baca*, 71 N.M. 468, 475, 379 P.2d 765, 770 (1963) (analyzing whether a mother's contributory negligence in the death of her son bars her from receiving her share of statutory benefits); *see also Sanchez v. J. Barron Rice, Inc.*, 77 N.M. 717, 720, 427 P.2d 240, 242 (1967) (citing *Baca* for the proposition that

statutory beneficiary's contributory negligence bars recovery from wrongful death proceeds); *Latimer v. City of Clovis*, 83 N.M. 610, 617, 495 P.2d 788, 795 (Ct.App. 1972) (same).

{25} In connection with this line of cases, we appreciate Father's argument that there is a distinction between application of ordinary contributory negligence principles to a specific type of negligence action, i.e. wrongful death, and Mother's argument here. Father claims that Mother is not merely applying ordinary negligence principles and is instead seeking to exclude a named class of beneficiary from the recovery, a result not contemplated by the Wrongful Death Act. However, we are not convinced that the end result should not be the same in both instances. Moreover, we are indeed convinced that *Baca* does stand for the proposition that the common law can aid in interpretation of statutes.

{26} Another New Mexico case is instructive. In *Wasson v. Wasson*, 92 N.M. 162, 164–65, 584 P.2d 713, 715–16 (Ct.App.1978), this Court refused to terminate a father's parental rights even though he had abandoned his children because, in the event of his death, his children would have lost the right to inherit from his estate or recover wrongful death benefits. We determined that the duty of the courts in proceedings involving children is to protect their legal rights. *Id.* at 163, 584 P.2d at 714. However, we stated that, "[i]f the rights of children were not divested, the trial court and this Court would favor a termination of the father's parental rights with the children." *Id.* Thus, as early as *Wasson*, our view was that where, as here, a child's rights did not have to be protected, a father does not necessarily have the right to benefit from his children if he has abandoned them. *Wasson*'s reasoning directly applies in a case like this one, where the rights of the child are not only divested, but are not even at issue, leaving only the father's right to collect wrongful death benefits.

{27} In the face of these specific precedents, we are not convinced that *Aranda v. Camacho*, 1997–NMCA–010, ¶¶ 2–3, 122 N.M. 763, 931 P.2d 757, on which Father relies, precluded the trial court's reasoning or result. That case ruled that a husband who ran over his wife and pleaded guilty to vehicular homicide did not forfeit his rights as sole wrongful death beneficiary. Importantly, the statutes that may have precluded recovery in that case applied only to intentional killings. *Id.* Furthermore, *Aranda*'s refusal to make a Probate Code provision applicable to preclude wrongful death benefits does not preclude the use of Probate Code law, along with other laws, to indicate public policy regarding the right of a parent who has abandoned a child to recover wrongful death benefits upon the death of that child.

## CONCLUSION

{28} In filing her amended petition, Mother did exactly as we contemplated in *Dominguez*. In turn, the trial court considered abandonment and non-support, pursuant to the views expressed in *Dominguez*, in making its final ruling. The facts concerning abandonment and non-support are not challenged on appeal. We now hold that *Dominguez* is the law in New Mexico and, accordingly, find no error in the approach taken in the trial court.

{29} We affirm.

{30} **IT IS SO ORDERED.**

WE CONCUR: A. JOSEPH ALARID and JONATHAN B. SUTIN, Judges.