**Certiorari Granted, September 9, 2011, No. 33,133**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2011-NMCA-090**

**Filing Date: June 24, 2011**

**Docket No. 29,390**

**HERMAN SPENCER,**

      **Third-Party Plaintiff/Appellant,**

**v.**

**PAUL BARBER and BARBER &
BORG, LLC,**

      **Third-Party Defendants/Appellees,**

**and**

**ELLEN SAM, as Personal Representative
of the Estate of Hermanda Spencer (Deceased),**

      **Plaintiff/Counter-Defendant/Appellee,**

**v.**

**HERMAN SPENCER,**

      **Defendant/Counter-Plaintiff/Appellant.**

**APPEAL FROM THE DISTRICT COURT OF McKINLEY COUNTY
Grant L. Foutz, District Judge**

Luebben Johnson & Barnhouse, LLP
Randolph H. Barnhouse
Kelli J. Keegan
Los Ranchos de Albuquerque, NM

for Appellant

Madison, Harbour & Mroz, P.A.
M. Eliza Stewart
Jacqueline Olexy
Albuquerque, NM

for Appellees

**OPINION**

**FRY, Judge.**

**{1}** This case evolved from a wrongful death action filed by Plaintiff Ellen Sam as personal representative of the estates of her daughter, Hermanda Spencer, and her granddaughter, Lydia Burnett. Through her attorneys, third-party Defendants Paul Barber and the law firm of Barber & Borg, LLC (collectively Barber), Sam entered into a settlement agreement with decedent Hermanda Spencer's father, Defendant Herman Spencer (Spencer), concerning Spencer's entitlement to proceeds from the wrongful death case. Spencer later repudiated the settlement agreement, Sam sued Spencer for enforcement of the agreement, and Spencer filed a third-party complaint against Barber, claiming that Barber wrongfully induced Spencer to sign the agreement and that he breached duties owed to Spencer as a statutory beneficiary of the wrongful death estates.

**{2}** The district court granted Barber's motion for summary judgment and, in accordance with *Leyba v. Whitley*, 120 N.M. 768, 907 P.2d 172 (1995), held that any duties Barber may have owed Spencer as a statutory beneficiary ended when an adversarial relationship developed between Sam and Spencer. We agree with this determination and affirm summary judgment on this issue. The district court also granted summary judgment on the question of the enforceability of the settlement agreement between Sam and Spencer and held that the agreement was enforceable. We conclude that issues of material fact precluded summary judgment on this issue and reverse this aspect of the district court's judgment.

**BACKGROUND**

**{3}** Sam retained Barber to represent her in the wrongful death action she filed as personal representative of the estates of Hermanda Spencer and Hermanda's daughter, Lydia Burnett. As previously mentioned, Spencer was Hermanda's father and Lydia's grandfather. It is undisputed that both Sam and Spencer were potential statutory beneficiaries of both estates pursuant to the Wrongful Death Act, NMSA 1978, Sections 41-2-1 to -4 (1882, as amended through 2001).

**{4}** Spencer knew nothing about the wrongful death case that Sam was pursuing until nearly a year after it was filed. Sam took the position that Spencer had abandoned Hermanda and was therefore not entitled to share in the proceeds of the estates' ultimate recovery. *See*

2

*Perry v. Williams*, 2003-NMCA-084, ¶¶ 20, 22, 133 N.M. 844, 70 P.3d 1283 (holding that a parent who fails to support a child may not benefit from a wrongful death recovery).

**{5}**     Approximately ten months after Barber filed the lawsuit on Sam's behalf, some but not all of the defendants in that case made offers to settle with Sam.  Barber located Spencer at his employer's place of business and met with him in order to offer to settle any claims Spencer may have had regarding the wrongful death estates.  At the time of this meeting, Barber claimed that he did not know the final settlement amount in the wrongful death case, nor did he know how any settlement would be divided between the two estates.  However, Barber did know that two of the defendants in the case had offered to settle for a total of $900,000.  Barber told Spencer that he was a lawyer representing Sam in a suit against certain entities for the deaths of Spencer's daughter and granddaughter.  He told Spencer that the case was close to settling.  Spencer asked Barber how much the settlement was and, according to Spencer, Barber did not say.  Barber, on the other hand, recalled telling Spencer that the settlement was "a large or very large amount."

**{6}**     Barber told Spencer that he was not Spencer's lawyer, and Spencer understood this.  Spencer also understood that Sam was Barber's client.  Although Barber recalled telling Spencer that he could seek advice from his own lawyer, Spencer did not recall this discussion. Barber recalled telling Spencer that Sam was willing to settle Spencer's potential claims against the estates for $10,000 or $15,000, while Spencer recalled Barber initially offering $10,000, plus release of Spencer's obligation to pay child support, which amounted to approximately $14,000.  Spencer asked if he could get $20,000 plus release of the child support obligation, which was apparently being garnished from Spencer's wages.  Barber responded that he would have to ask Sam for authority to do this.  A short time later, Sam agreed to settle with Spencer for $20,000, plus forgiveness of Spencer's child support obligation.

**{7}**     Barber produced a settlement agreement for Spencer's signature.  Spencer had an opportunity to read the agreement and, according to Barber, he said he understood it and had no questions.  Spencer agreed to the settlement of $20,000, plus forgiveness of the child support obligation, and he and Barber agreed to meet again after lunch so that Spencer could sign the settlement agreement before a notary.  After lunch, Spencer and Barber went to the office of attorney Robert Ionta, where Spencer signed the agreement before a notary.

**{8}**     Barber told Spencer it would take at least 30 days for the settlement in the underlying case to be finalized and for the money to become available.  A few weeks later, Spencer received in the mail a copy of the settlement agreement he had signed and, a few days later, a check in the amount of $20,000.  Between the time Spencer met with Barber and the time he received the agreement and the check, Spencer thought he had made a deal with Barber.  However, once he received the agreement, Spencer wanted to make sure he was "doing it right," so he called attorney William Keeler.  After talking to Keeler, Spencer decided not to accept the check. Keeler sent a letter to Barber asking him not to distribute the settlement proceeds in the underlying case until it could be determined how much of that settlement Spencer was entitled to.

**{9}** In the meantime, according to Barber, Sam relied on Spencer's settlement of his claims against the estates in agreeing to settle with the defendants in the underlying case. In fact, later the same day as his meeting with Spencer, Barber emailed the attorneys for the defendants in the underlying case and accepted settlement offers totaling $900,000. In addition, Barber, on Sam's behalf, asked the Navajo Nation Child Support Department for the forms necessary to effectuate a waiver of child support from Spencer.

**{10}** After Spencer repudiated the settlement agreement he had signed, Sam filed suit against Spencer seeking a declaration that the agreement was binding. Spencer then filed a counterclaim against Sam and a third-party complaint against Barber and his law firm. In the third-party complaint, Spencer alleged that Barber deceived Spencer and induced him into signing the settlement agreement and that Barber breached duties owed to Spencer as a beneficiary of the wrongful death estates.

**{11}** Barber filed a motion for summary judgment on Spencer's third-party claims and sought a determination that the settlement agreement was enforceable and that Spencer breached the settlement agreement. Barber's primary argument was that the undisputed facts established the existence of all elements of an enforceable contract. Spencer responded and argued that Barber breached various duties he owed to Spencer, including (1) a duty to disclose, (2) a duty of reasonable care owed as the attorney for the wrongful death estates, (3) a duty to deal fairly and honestly in contract formation, and (4) a duty to protect Spencer's interests in the wrongful death estates. Spencer further argued that the settlement agreement was unenforceable because (1) Barber misrepresented an essential term of the agreement, (2) Spencer was mistaken as to a basic assumption underlying the agreement, and (3) the agreement was a contingent contract that was canceled before the contingencies were met. Barber's reply brief argued that Spencer understood the settlement agreement, bargained for more favorable terms, and willingly signed the agreement of his own volition. Barber further argued, in reliance on *Leyba*, 120 N.M. 768, 907 P.2d 172, that even if he owed Spencer a duty as a beneficiary of the wrongful death estates, the adversarial relationship between Spencer and Barber's client, Sam, terminated that duty.

**{12}** Without holding a hearing, the district court entered an order granting summary judgment in favor of Barber. The court concluded that there was no genuine issue of material fact and that (1) Barber did not owe a duty to Spencer because of the adversarial relationship between Spencer and Sam, and (2) the settlement agreement between Sam and Spencer was enforceable. The court held that Spencer's recovery for the death of Hermanda Spencer was limited to that allowed under the terms of the settlement agreement. This appeal followed.

**DISCUSSION**

**{13}** "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Self v. United Parcel Serv., Inc.*, 1998-NMSC-046, ¶ 6, 126 N.M. 396, 970 P.2d 582. "We review these legal questions de novo." *Id.*

4

**{14}**     Spencer makes three primary arguments on appeal.  First, he maintains that the district court improperly determined that *Leyba* barred his claims against Barber.  Second, he contends that the settlement agreement was unenforceable for a number of reasons. Third, he claims that issues of fact precluded summary judgment.  We turn now to his first contention.

### 1.     Whether *Leyba* Barred Spencer's Claims Against Barber

**{15}**     In his third-party complaint against Barber, Spencer asserted essentially two claims, including the one we now address, which is that Barber breached certain duties owed to Spencer.  This claim rests on our Supreme Court's decision in *Leyba*.

**{16}**     In *Leyba*, the Court addressed the duties owed by an attorney handling a wrongful death case.  120 N.M. at 769-70, 907 P.2d at 173-74.  In that case, Leyba, the conservator for her minor son, sued attorneys who had handled a claim for the wrongful death of the child's father.  *Id.*  Although the child was the estate's sole statutory beneficiary, the attorneys handling the case had paid all of the proceeds from the case to the decedent's mother, the personal representative of the estate.  *Id.*  Instead of disbursing the proceeds to the child beneficiary, the personal representative had dissipated the proceeds, and the child recovered a mere fraction of the total.  *Id.*  Leyba maintained that the attorneys owed her son a duty to ensure that he received the proceeds and that they had breached that duty.  *Id.*

**{17}**     In considering whether the attorneys owed a duty to the child—who was not the attorneys' client—the Court considered a number of cases from other jurisdictions and ultimately concluded that an attorney owes a duty to a nonclient if the attorney and the client intended to benefit the nonclient.  *Id.* at 773, 907 P.2d at 177.  In determining whether the attorney and the client so intended, the Court adopted a balancing test.  *Id.* at 774-75, 907 P.2d at 178-79.  However, in the particular context of a wrongful death case, the Court went on to conclude that application of the balancing test is not necessary; "the very nature of a wrongful death action is such that we will imply in law a term in every agreement between an attorney and personal representative that the agreement is formed with the intent to benefit the statutory beneficiaries of the action."  *Id.* at 776, 907 P.2d at 180.

**{18}**     In the present case, consistent with this holding in *Leyba*, the law implied a term in Barber's agreement to represent Sam in the wrongful death case to the effect that Barber's pursuit of the case was not only for the benefit of Sam, in her personal capacity as the mother and grandmother of the decedents, but also for the benefit of Spencer because Spencer was a statutory beneficiary.  However, the Court in *Leyba* carved out an exception to this duty owed to a nonclient in a wrongful death case, which it called "the adversarial exception." *Id.*

**{19}**     In explaining the adversarial exception, the Court in *Leyba* observed that

> [t]he policy considerations against finding a duty to a nonclient are the strongest where doing so would detract from the attorney's ethical obligations to the client.  This occurs where a duty to a nonclient creates a

5

risk of divided loyalties because of a conflicting interest or of a breach of confidence.

*Id.* (alteration in original) (internal quotation marks and citation omitted). The Court then discussed a Colorado case that had adopted the adversarial exception in a wrongful death case in which adverse interests developed between the personal representative and other statutory beneficiaries such that the attorneys retained by the personal representative "could not ethically represent both sides." *Id.* at 777, 907 P.2d at 181 (internal quotation marks and citation omitted). As a result, the Colorado court held that "[u]nder these circumstances, [the attorneys'] only client was [the personal representative]." *Id.* (internal quotation marks and citation omitted).

**{20}** Our Supreme Court explained the Colorado case, noting that, "rather than applying the adversarial exception to deny the existence of a duty to the nonclient, the [Colorado court] found a duty to exist and a breach of that duty to arise out of continuing representation of conflicting interests. We concur and believe that any such conflict should be resolved by notice to the nonclient that the latter cannot rely on the attorney to act for his or her benefit." *Id.* (citation omitted). The Court then concluded that "when recognition of a duty running from an attorney to the third party would burden the attorney's duty to the client in a wrongful death action—as when an adversarial relationship develops between the client and the third party—as a matter of public policy the attorney's duty to the third party should end." *Id.* at 778, 907 P.2d at 182. The Court went on to note that "[s]hould a conflict arise, the adversarial exception negates duty only if the third party knows or should know that he or she cannot rely on the attorney to act for his or her benefit." *Id.*

**{21}** Barber argues and the district court concluded that the adversarial exception applied in the present case such that any duty Barber may have owed to Spencer ended because of the adversarial relationship between Sam and Spencer. The relationship was adversarial because Sam took the position that the estates owed nothing to Spencer because he had abandoned his daughter, decedent Hermanda Spencer. *See Perry*, 2003-NMCA-084, ¶¶ 20, 22 (holding that a parent who fails to support a child may not benefit from a wrongful death recovery). Spencer maintains that the district court improperly applied the adversarial exception because: (1) Barber created the adversarial relationship, and the exception can apply only if the beneficiary creates the adversarial relationship; (2) the adversarial exception impacts only contract remedies, not the tort remedies Spencer sought; and (3) Barber improperly raised the adversarial exception for the first time in the reply brief he filed in the district court. We address each of Spencer's contentions in turn.

a.      **Creation of the Adversarial Relationship**

**{22}** Spencer initially argues that Barber owed attorney/client duties to Spencer, a statutory beneficiary, when Barber undertook to represent the decedents' estates in the wrongful death action. *Leyba* supports the view that Barber owed Spencer—a nonclient—a duty of reasonable care arising out of an intent implied in Barber's agreement with his client, Sam. *See* 120 N.M. at 775-76, 907 P.2d at 179-80 (explaining that intent to benefit a third party is implied by law "in every agreement between an attorney and personal representative

6

that the agreement is formed with the intent to benefit the statutory beneficiaries"). However, we see nothing in *Leyba* establishing that the attorney's duties to the intended beneficiary equate to all of the duties owed to the attorney's client. Nonetheless, we continue our analysis consistent with the premise that Barber owed Spencer a duty of reasonable care. *See id.* at 771, 907 P.2d at 175 (stating that "an implied term of an attorney's contract to provide professional services for the benefit of a third party is the promise to render services with reasonable skill and care").

**{23}** Spencer then goes on to assert that Barber himself created the adversarial relationship upon which the adversarial exception relies by breaching several duties imposed by the Code of Professional Conduct. Spencer relies on a statement in *Leyba* to the effect that "[t]he fact that an attorney identifies a conflict, actual or potential, should not, however, in itself negate the duty owed to the statutory beneficiaries." *Id.* at 778, 907 P.2d at 182. Instead, Spencer maintains, the Supreme Court in *Leyba* recognized that procedures set out in Rules 16-107(A), -116(A)(1), (D) NMRA apply, and that they "specify[] procedures for terminating representation when there is a conflict of interest." *Lebya*, 120 N.M. at 778, 907 P.2d at 182. Thus, Spencer argues, Barber's representation of Spencer was in conflict with his representation of Sam from its inception, and Barber was obliged to withdraw in accordance with the detailed process outlined in Rule 16-116(D). Because Barber did not withdraw from representation, according to Spencer, he created the adversarial relationship and cannot rely on it now as an exception to his duty to Spencer.

**{24}** We are not persuaded. Spencer's arguments constitute an unjustified extension of *Leyba*'s holding. *Leyba* did not focus on the Code of Professional Conduct in its discussion of the adversarial exception. Instead, the Court noted that even if an attorney identifies an actual or potential conflict, the attorney continues to owe a duty to the third-party beneficiary *unless* "the third party knows or should know that he or she cannot rely on the attorney to act for his or her benefit." *Leyba*, 120 N.M. at 778, 907 P.2d at 182. In the present case, the evidence established that when Spencer met with Barber, Spencer knew that Barber was representing Sam, he knew that Barber was not his attorney, and he knew that Barber was not providing any services to him. Indeed, Spencer negotiated with Barber to obtain a better settlement for himself.

**{25}** Along these same lines, Spencer further argues that Barber breached the duty of loyalty he owed Spencer by failing to avoid conflicts of interest and by "generating an adversarial relationship" or by "assisting the personal representative in doing so." Thus, Spencer asserts, the duty of loyalty should have prevented Barber from "creat[ing] an adversarial relationship sufficient to negate other duties owed" to Spencer.

**{26}** We do not agree. While an attorney owes his client "a duty of loyalty," *Rael v. Blair*, 2007-NMSC-006, ¶ 10, 141 N.M. 232, 153 P.3d 657 (internal quotation marks and citation omitted), Spencer has not cited any authority for the proposition that an attorney owes a third party a duty of loyalty if the third party's interests are adverse to the client's interests. Indeed, this is precisely the situation addressed by the adversarial exception discussed in *Leyba*. If an attorney identifies a conflict between his client and a third-party beneficiary, then the attorney should give notice to the third party that he or she "cannot rely on the

7

attorney to act for his or her benefit," *Leyba*, 120 N.M. at 777, 907 P.2d at 181, and the adversarial exception negates the duty owed to the third party. *See id.* at 778, 907 P.2d at 182 (noting that the adversarial exception negates duty if a conflict arises and "if the third party knows or should know that he or she cannot rely on the attorney to act for his or her benefit"). It defies logic to suggest that in such a situation the attorney must withdraw from representation of his or her client in order to represent the interests of the third party, which is the scenario Spencer seems to suggest.

{27}    Spencer next argues that Barber admitted that he breached duties owed Spencer before the adversarial relationship developed and, therefore, Barber cannot take advantage of the adversarial exception. Although Spencer's argument is somewhat convoluted and difficult to follow, we understand his contention to be that the adversarial relationship did not come into existence until Barber presented Spencer with Sam's settlement offer and, as a result, all of the actions Barber took prior to that time that were in derogation of his duties to Spencer amounted to breach of professional duties giving rise to Barber's liability to Spencer for malpractice. Spencer bases this argument on a statement in one of Barber's district court pleadings, which stated: "When . . . Spencer was presented with . . . Sam's offer to settle his interests in the wrongful death estate because she considered her interests to be adverse to his, *Leyba*'s adversarial exception immediately went into effect."

{28}    We are not persuaded by Spencer's argument. Spencer fails to specify what Barber did prior to his meeting with Spencer that constituted breach of the duty of reasonable care he owed Spencer as a third-party beneficiary. Prior to the meeting, Barber had not accepted any settlement offers from the tortfeasors in the underlying case on behalf of the wrongful death estates. Thus, Barber had not done anything reflecting a failure to exercise reasonable care for the benefit of the estates' statutory beneficiaries, including Spencer. Once Barber determined that Sam's position—that Spencer had abandoned Hermanda Spencer and consequently was not entitled to recover from the wrongful death estates—conflicted with Spencer's interest as a potential statutory beneficiary, he took steps to make Spencer aware of the conflict and of the fact that Barber could not act for Spencer's benefit. This was precisely the scenario set out in *Leyba* as the proper approach to take.

{29}    In addition, Spencer argues that only the beneficiary may establish the adversarial relationship giving rise to the exception. In his view, allowing the adversarial relationship to be "created" by the personal representative renders meaningless the duties owed by the personal representative's attorney to the statutory beneficiaries. We do not agree. In our view, *Leyba* envisioned the attorney for a wrongful death estate as having the usual attorney duties toward his or her client and, in addition, a duty of reasonable care toward the estate's beneficiaries, so long as the interests of the client and the nonclients are consistent. Once a conflict in those interests arises, however, the attorney does not have to withdraw from representation of his or her client. *See id.* at 777, 907 P.2d at 181 (citing with approval a Colorado case holding that "[u]nder these circumstances, [the attorneys'] only client was [the personal representative]." (alterations in original) (internal quotation marks and citation omitted)). Instead, the attorney is obliged to notify the nonclient beneficiaries of the conflict and of the fact that the attorney can no longer act for the benefit of the nonclients. *See id.* (explaining that "any such conflict should be resolved by notice to the nonclient that the

8

latter cannot rely on the attorney to act for his or her benefit"). Thus, the attorney continues to represent the client, with whom he or she has entered into a contract of representation, and the nonclients may seek their own representation. This is precisely what happened in the present case.

### b. The Adversarial Exception's Impact on Tort Remedies

{30} Spencer next argues that the adversarial exception applies only to terminate Barber's contractually based professional duties and, therefore, the district court improperly granted summary judgment in favor of Barber on Spencer's tort claims. In support of this argument, Spencer relies on what he characterizes as *Leyba*'s distinction between the "traditional contract remedies with respect to the bargain intended for [the third-party beneficiary's] benefit," 120 N.M. at 771, 907 P.2d at 175, and "traditional tort claims against an attorney for misrepresentation, fraud, and collusion, none of which depend upon a duty arising out of contract." *Id.* at 773 n.3, 907 P.2d at 177 n.3. Spencer maintains that the Court in *Leyba* applied the adversarial exception only to contractually based duties and that the exception "has no bearing on tort claims."

{31} Spencer's argument is based on a misreading of *Leyba*. The Court in *Leyba* began its preliminary discussion by noting the general principles applicable to third-party beneficiary contracts, including the principle upon which Spencer relies, that a third-party beneficiary "is accorded traditional contract remedies with respect to the bargain intended for his or her benefit." *Id.* at 771, 907 P.2d at 175. The Court went on to observe that "the common law of torts also recognizes an attorney's duty to provide professional services with the skill, prudence, and diligence of attorneys of ordinary skill and capacity." *Id.* at 772, 907 P.2d at 176. The Court then stated that "the foundation of any malpractice claim by an intended beneficiary remains the express or implied contract that gives rise to the lawyer-client relationship." *Id.* This is because "[o]ut of the agreement to provide legal services to a client . . . arises the duty to act with due care as to the interests of the intended beneficiary." *Id.* (internal quotation marks and citation omitted). Against this backdrop, the Court then observed that many courts have determined that a third-party beneficiary cannot assert a "cause of action in tort aris[ing] from a breach of duty existing by virtue of a contract unless there exists between the defendant and the injured person what is termed privity of contract." *Id.* (alteration omitted) (internal quotation marks and citation omitted).

{32} It is clear that up to this point in the *Leyba* opinion, the Court was simply providing historical background. The Court then announced its determination that "we join those jurisdictions that have rejected any stringent privity test as the touchstone of an attorney's duty to a nonclient." *Id.* at 773, 907 P.2d at 177.

> [I]t seems logical to treat an intended (not incidental) third-party beneficiary as though in privity of contract and accord such a beneficiary traditional remedies in the enforcement of promises *and common-law duties* in his or her own right and not simply in the enforcement of the promisee's right. As we explain below, however, *whether in contract or tort*, it is nonetheless the

9

intent of the attorney and client to benefit the third party that forms the basis of a malpractice action by the third party.

*Id.* (emphasis added). Contrary to Spencer's argument, it is evident from the emphasized language that the Court did not draw a distinction between a contract-based claim of malpractice and a tort-based claim of malpractice.

**{33}** The Court went on to analyze how a court can determine whether the attorney and client intended to benefit the third party, and it ultimately adopted a balancing test for this purpose. *Id.* at 774-75, 907 P.2d at 178-79. The Court went beyond the balancing test and, as we have previously noted, it held that in every wrongful death case in which an attorney represents a personal representative, the law will imply a term "that the agreement is formed with the intent to benefit the statutory beneficiaries of the action." *Id.* at 776, 907 P.2d at 180. The Court then adopted the adversarial exception to this implied term. *Id.* at 777-78, 907 P.2d at 181-82.

**{34}** At no point in the opinion did the *Leyba* Court suggest that the adversarial exception applied only to contractually based claims made by a third-party beneficiary against the personal representative's attorney. To the contrary, the Court indicated that it made no difference whether the third party based his or her malpractice claim on a theory of contract or on a theory of tort. The Court expressly stated that a third-party beneficiary may have "remedies in the enforcement of promises and common-law duties," *id.* at 773, 907 P.2d at 177, and common law duties certainly encompass duties recognized in tort law.

**c.     Raising Adversarial Exception for the First Time in the Reply Brief**

**{35}** Spencer also argues that the district court improperly considered Barber's argument regarding the adversarial exception because Barber failed to cite *Leyba* or mention the exception until he filed his reply brief in support of his motion for summary judgment. In support of this argument, Spencer cites a case from a federal district court in New York.

**{36}** We disagree with Spencer's contention. While Barber did not mention *Leyba* in his initial brief in support of his motion for summary judgment, Spencer cited *Leyba* in his response brief and discussed it at some length. In his reply, Barber responded to Spencer's arguments, including his arguments based on *Leyba*, and asserted *Leyba*'s adversarial exception, which Spencer had failed to mention in his brief. We are not aware of any New Mexico authority that would preclude a party from responding in a reply brief to arguments made by the opposing party.

**d.     Summary**

**{37}** In conclusion, we determine that the district court properly applied *Leyba*'s adversarial exception in the present case and held that any duty Barber owed Spencer was negated by the exception. Barber proceeded with his representation of Sam in the wrongful death case in a manner that was not inconsistent with the duty of reasonable care he owed Spencer as a statutory beneficiary. Once the wrongful death case approached settlement

with the alleged tortfeasors, the interests of Barber's client, Sam, and the interests of Spencer diverged. Sam took the position that Spencer was not entitled to any proceeds from the wrongful death case due to his alleged abandonment of the decedent Hermanda Spencer. Thus, Barber's continued representation of Spencer's interests "create[d] a risk of divided loyalties because of a conflicting interest." *Id.* at 776, 907 P.2d at 180 (internal quotation marks and citation omitted). Consequently, Barber did what *Leyba* instructs an attorney to do in such a circumstance: he told Spencer that he was acting only on behalf of Sam, and Spencer acknowledged that he understood this. *Id.* at 777, 907 P.2d at 181 (explaining that "any such conflict should be resolved by notice to the nonclient that the latter cannot rely on the attorney to act for his or her benefit"). The district court's decision was consistent with *Leyba*. Thus, to the extent the summary judgment dismissed Spencer's malpractice claims against Barber, we affirm that judgment.

## 2. Whether the Settlement Agreement was Enforceable

{38}    Even if the district court properly applied *Leyba*, Spencer maintains that it erred for a number of reasons in determining that the settlement agreement was enforceable. He argues that: (1) Barber breached the duty to disclose or misrepresented a material term of the agreement; (2) Barber breached the duty to deal fairly and honestly with Spencer; (3) the agreement was unconscionable and presumptively fraudulent; (4) the agreement was voidable; and (5) the agreement was contingent and canceled before the contingencies were met. We conclude that genuine issues of material fact precluded summary judgment on the enforceability of the agreement.

### a. Whether There was Failure to Disclose or Misrepresentation of a Material Term

{39}    Spencer argues that "there was a settlement [of the underlying wrongful death case] before . . . Barber ever spoke to . . . Spencer." He asserts that Barber failed to disclose the amount of this settlement to Spencer even when Spencer asked about the amount and, as a result, the failure to disclose constituted a "misrepresentation sufficient to invalidate the agreement" that Spencer ultimately signed.

{40}    In support of his argument, Spencer relies on several provisions of the Restatement (Second) of Contracts. This Court relied on the same provisions in *Sisneros v. Citadel Broadcasting Co.*, where we outlined the requirements for finding a contract to be voidable due to the misrepresentation of one of the parties to the contract. 2006-NMCA-102, ¶¶ 18-23, 140 N.M. 266, 142 P.3d 34. We explained that in order for a contract to be deemed voidable due to misrepresentation, "the recipient of the misrepresentation must show that (1) there was a misrepresentation that was (2) material or fraudulent and which (3) induced the recipient to enter into the agreement, and that (4) the recipient's reliance on the misrepresentation was justified." *Id.* ¶ 19.

{41}    In the present case, Spencer contends that Barber's failure to disclose the anticipated amount of the estates' settlement with the tortfeasors was the same as an affirmative misrepresentation of a material term of the settlement agreement Spencer ultimately signed.

11

*See* Restatement (Second) of Contracts § 161 cmt. a (1981) (explaining that if a party is making a contract, "his assertion of only some of the facts without the inclusion of such additional matters as he knows or believes to be necessary to prevent it from being misleading is itself a misrepresentation"). Spencer maintains that without knowing how much money was at stake, he was in no position to evaluate the reasonableness of Sam's offer to settle with Spencer for $20,000, plus forgiveness of the child support obligation.

**{42}**   We conclude that the evidence presented by Spencer created issues of material fact on at least two of the elements of misrepresentation. First, there was conflicting evidence as to whether there was a misrepresentation. While Barber attested that he told Spencer that the expected settlement of the wrongful death claims was "large or very large," Spencer testified that Barber did not answer when Spencer asked him the amount of the anticipated settlement. It is for the fact finder to determine whose testimony to believe and whether the statement or the silence, as the case may be, constituted a misrepresentation.

**{43}**   Second, if there was a misrepresentation, there are issues of fact as to whether it was material or fraudulent. "If a fact is intentionally withheld for the purpose of inducing action, this is equivalent to a fraudulent misrepresentation." Restatement (Second) of Contracts § 161 cmt. b. Barber claims that disclosing the anticipated amount of the settlement to Spencer would itself be misleading because Barber did not know the final amount of the settlement or how the settlement would be divided between the estates of Hermanda and Lydia. On the other hand, Spencer points out that Barber obviously had a fairly good idea about the amount of the settlement because he accepted offers totaling $900,000 the evening after Spencer signed the settlement agreement. Consequently, Spencer argues, Barber should have told him about these offers so that Spencer could make an informed decision about the settlement offered to him by Sam. Again, the conflicting testimony gives rise to an issue of fact best determined by the fact finder.

**{44}**   To the extent that the summary judgment determined that the settlement agreement was enforceable, we reverse that determination. Given our holding on this issue, we need not address Spencer's arguments that the agreement was unconscionable, that it was voidable due to Barber's failure to deal with Spencer fairly, or that it was canceled before various contingencies were met.

**CONCLUSION**

**{45}**   For the foregoing reasons, we affirm that aspect of the district court's summary judgment dismissing Spencer's malpractice claims against Barber, and we reverse that aspect of the summary judgment determining that the settlement agreement was enforceable. We remand for further proceedings consistent with this opinion.

**{46}   IT IS SO ORDERED.**

_____
**CYNTHIA A. FRY, Judge**

12

**WE CONCUR:**

_____

**CELIA FOY CASTILLO, Chief Judge**


_____

**JAMES J. WECHSLER, Judge**


**Topic Index for** _Spencer v. Barber_**, Docket No. 29,390**

| | |
|---|---|
| **AT** | **ATTORNEYS** |
| AT-PR | Professional Responsibility |
| | |
| **CP** | **CIVIL PROCEDURE** |
| CP-SE | Settlement Agreement |
| CP-SJ | Summary Judgment |
| | |
| **CN** | **CONTRACTS** |
| CN-FR | Fraud, Duress, or Mistake |
| CN-TB | Third Party Beneficiary |
| | |
| **DR** | **DOMESTIC RELATIONS** |
| DR-AB | Abandonment |
| DR-CT | Child Support |
| DR-PR | Parental Rights |
| | |
| **TR** | **TORTS** |
| TR-RE | Release |
| TR-WD | Wrongful Death |